FILED
United States Court of Appeals
Tenth Circuit

November 25, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

BARBARA MITTEN HENNAGIR,

Plaintiff–Appellant,

v.

UTAH DEPARTMENT OF
CORRECTIONS; SCOTT CARVER;
MIKE CHABRIES; RICHARD
GARDEN

Defendants–Appellees.

No. 08-4087

**ORDER**

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

This matter is before the court on appellant's petition for panel rehearing.

In her petition, Barbara Hennagir seeks rehearing on several different grounds.

We deny the petition as it relates to her claim for disability discrimination. With

respect to her request that we reconsider our analysis of her retaliation claim,

however, we have determined an amendment of our original opinion is warranted.

Therefore, the petition is granted in part with respect to appellant's argument that

the court misconstrued the facts when reviewing her retaliation claim. The new

amended opinion is attached.  The mandate shall issue forthwith.

Entered for the Court

Elisabeth A. Shumaker
Clerk of Court

FILED
United States Court of Appeals
Tenth Circuit

**September 9, 2009**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

BARBARA MITTEN HENNAGIR,

Plaintiff–Appellant,

v.

UTAH DEPARTMENT OF
CORRECTIONS; SCOTT CARVER;
MIKE CHABRIES; RICHARD
GARDEN,

Defendants–Appellees.

No. 08-4087

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:05-CV-01043-DAK)**

---

Russell T. Monahan, Cook & Associates, P.C., Salt Lake City, Utah, for
Plaintiff–Appellant.

J. Clifford Peterson, Assistant Utah Attorney General (Mark L. Shurtleff, Utah
Attorney General, with him on the briefs), Salt Lake City, Utah, for
Defendants–Appellees.

---

Before **BRISCOE**, **SEYMOUR**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case requires us to determine whether a job function that is rarely required in the normal course of an employee's duties may nonetheless be an essential job function under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). We conclude that when the potential consequences of employing an individual who is unable to perform the function are sufficiently severe, such a function may be deemed essential. We further conclude that it is unreasonable for an employee to demand identical job duties less the disputed essential job requirement, regardless of the label given to the proposed accommodation.

Plaintiff Barbara Hennagir was employed as a physician's assistant ("PA") by the Utah Department of Corrections ("DOC"). Following several years of successful work by Hennagir, DOC added a physical safety training requirement to medical and clinical positions that required inmate contact, including Hennagir's position. Unable to complete the training because of a number of physical impairments, Hennagir complained of disability discrimination and requested that she be able to continue in her position without fulfilling the new requirement. DOC refused, leading to this lawsuit. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's grant of summary judgment in favor of defendants[1] on all of Hennagir's claims.

---

[1] In addition to DOC, Hennagir filed suit against several DOC officials.

(continued...)

**I**

From April 1997 until August 2005, Hennagir was employed as a PA at
DOC's Central Utah Correctional Facility in Gunnison, Utah ("Gunnison").
When she was hired, DOC did not require Peace Officer Standards and Training
("POST") certification for medical and clinical staff at Gunnison. In 2001,
however, DOC sought to enter such staff into Utah's Public Safety Retirement
system ("PSR"). To enroll in PSR, all covered positions in the agency must be
POST certified. POST certification includes an assessment of physical strength,
flexibility, and endurance.

DOC considered the POST certification requirement for medical staff for
several years. As early as September 1998, a DOC division director
recommended POST certification to the executive director. In 1999, a medical
technician was attacked by a Gunnison inmate, and the victim sued DOC and a
number of its employees, leading the State Risk Management Division to echo the
POST certification recommendation. The following year, DOC clinical services
administrators met to discuss POST certification. At that meeting, questions were
raised as to whether incumbent employees could be "grandfathered" in—that is,
exempted from the POST requirement based on their status as current employees.

In 2001, DOC contacted Utah Retirement Systems ("URS") regarding its

---

[1](...continued)
We use "DOC" to refer to all defendants.

plan to enroll medical and clinical personnel in PSR.  URS advised that workers could be eligible for PSR only if every employee in a given position was POST certified.  In 2002, DOC applied for PSR for all its clinical personnel whose job duties required contact with inmates.  Because Hennagir's PA position at Gunnison included inmate contact, it was approved for PSR, and thus POST certification was mandated.

Gunnison medical staff began attending a POST "academy" in October of 2002.  Hennagir attended, but was given permission not to participate in the physical activities because of her medical conditions.  Hennagir complains of a number of impairments, including lupus, osteoarthritis, rheumatism, avascular necrosis, Sjögren's syndrome, and fibromyalgia.  She has had both hips replaced and undergone surgery on her left shoulder.  As a result of these maladies, Hennagir is limited in activities such as sitting, bathing, sleeping, lifting, bending and flexing, climbing stairs, running, and biking.

DOC eventually opted to require POST certification for incumbent employees.  In October 2003, Hennagir was notified that she would be unable to continue working as a PA at Gunnison because she was unable to meet the POST certification requirement.

In response, Hennagir filed an administrative grievance in November 2003, asserting that the threat of termination constituted harassment on the basis of disability and that she should be "grandfathered" through the new POST

requirement. David Worthington, then DOC's Director of the Division of Institutional Operations, responded that he did not have the power to exempt Hennagir from POST certification. Instead, DOC offered her a PA position at DOC's Olympus Facility in Draper, Utah ("Olympus") that did not require POST certification. Hennagir internally appealed Worthington's treatment of her grievance, arguing that POST certification was not a PA job requirement and that, because Olympus was over 100 miles from her home, it was not an acceptable substitute for her position at Gunnison. Then-Deputy Director Scott Carver met with Hennagir in January 2004, but determined that DOC could not alter the POST requirement and that Hennagir no longer met the minimum requirements for her position. He notified Hennagir that she would have to decide whether to accept the proposed transfer. However, DOC placed Hennagir's grievance on hold to allow time to review the classification issues regarding clinical positions and the Gunnison facility's needs.

On April 7, 2004—during this administrative hold—Hennagir filed a charge of disability discrimination in violation of the ADA with the Utah Anti-Discrimination and Labor Division, which forwarded the charge to the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC notified the Human Resources Director of DOC of Hennagir's complaint on April 26, 2004.

In July 2004, DOC issued a final determination regarding Hennagir's

grievance. It determined that all Gunnison PAs were required to be POST certified and that Hennagir had to choose between the Olympus PA position or termination. Rather than choosing from DOC's proffered options, Hennagir took medical leave under the Family and Medical Leave Act. When this leave was exhausted, she went on long-term disability. Due to surgery on her hip and shoulder, this leave lasted close to a year, during which DOC retained her position at Gunnison.

While on leave, Hennagir filed a second EEOC charge, alleging retaliation by DOC Medical Director Richard Garden and other unnamed individuals. Hennagir claimed that Garden improperly altered her performance evaluation in retaliation for her prior complaints. On April 19, 2004, Hennagir's direct supervisor issued an evaluation giving her "exceptional" results in each category and as an overall rating. According to that supervisor, Garden pressured her to lower Hennagir's evaluation because Hennagir had treated an inmate who sued DOC for inadequate care. On April 27, Hennagir's supervisor signed a new performance evaluation that rated Hennagir "unsuccessful" in the "application of job knowledge, judgment, problem-solving" category and provided an overall rating of "successful." Hennagir signed the document, but checked the box "I disagree with the evaluation," writing, "I acknowledge the incident but feel the judgment here is not warranted . . . ." Shortly thereafter, a third evaluation was filed in which Hennagir's "application of job knowledge, judgment, problem-

solving" evaluation was revised to "successful." Her overall evaluation remained "successful." Hennagir signed this evaluation, checking the box labeled "I agree with the evaluation." Her second EEOC charge also alleged that Garden unjustifiably called into question her treatment of a patient and that the proposed transfer to Olympus constituted retaliation for her complaints of disability discrimination.

In March 2005, before Hennagir returned from medical leave, the EEOC found reasonable cause to believe that Hennagir had been the victim of disability discrimination and that DOC's offer to transfer Hennagir to Olympus was not a reasonable accommodation. Accordingly, the EEOC initiated conciliation. By July 2005, however, it notified DOC that conciliation had apparently failed. DOC then informed the EEOC that it would make Hennagir one additional offer: a medical position at Gunnison auditing, reviewing, coordinating, and monitoring the contract care of inmates at the same salary. On August 29, 2005, Carver, now DOC Executive Director, wrote to Hennagir stating that because she had declined each of DOC's offers, including the auditing position described above, DOC was terminating her employment.

On August 31, 2005, the EEOC referred the matter to the Department of Justice for possible litigation. DOJ issued Hennagir a notice of right to sue, and Hennagir exercised that right on December 15, 2005. As amended, Hennagir's complaint alleges discrimination, denial of reasonable accommodation, and

retaliation in violation of the ADA, and the same in violation of the Rehabilitation Act.

DOC successfully moved for summary judgment on all claims. The district court concluded that Hennagir could not make out a discrimination claim because she "is neither disabled nor qualified for the [PA] position at [Gunnison]." It then determined that Hennagir's proposed accommodations were not reasonable. Finally, it rejected her retaliation claim, holding that neither the Olympus transfer nor the performance evaluations were materially adverse actions and that DOC had taken these actions for legitimate, nondiscriminatory reasons.

## II

We review a grant of summary judgment de novo, applying the same standard as the district court. Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1116 (10th Cir. 2004). Summary judgment is only appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id. Applying this standard, we address in turn each of Hennagir's challenges on appeal.

## A

Hennagir first argues that DOC discriminated against her in violation of the ADA. To succeed on an ADA claim,[2] a plaintiff must show: (1) she is disabled

---

[2] The ADA has been substantially amended via the ADA Amendments Act (continued...)

as defined by the ADA; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered discrimination on the basis of her disability. Kellogg v. Energy Safety Servs. Inc., 544 F.3d 1121, 1124 (10th Cir. 2008). Because each of these elements is essential to an ADA claim, and we conclude that Hennagir cannot satisfy the "qualified individual" prong, we need not address remaining elements. See Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999).

Hennagir bears the burden of showing that she is able to perform the essential functions of her job, with or without reasonable accommodation. Mason, 357 F.3d at 1119 (citing US Airways, Inc. v. Barnett, 535 U.S. 391, 400 (2002)). To determine whether POST certification is an essential job function, we begin by deciding "whether [DOC] actually requires all employees in the particular position to satisfy the alleged job-related requirement." Davidson v. Am. Online, Inc., 337 F.3d 1179, 1191 (10th Cir. 2003). If it does, we look to whether POST certification is fundamental to the Gunnison PA position. Id.; see also 29 C.F.R. § 1630.2(n)(1). Among the factors we consider in this inquiry are:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

[2](...continued)
of 2008. It is unnecessary to consider the effect of those changes, given that Hennagir was terminated in 2005.

- 9 -

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); see also Mason, 357 F.3d at 1119. However, this analysis "is not intended to second guess the employer or to require him to lower company standards. . . . Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it." Davidson, 337 F.3d at 1191 (citation omitted).

The undisputed evidence shows that all PAs at Gunnison must become POST certified. Under URS rules, all employees in a position must achieve POST certification once that position is approved for PSR enrollment. Further, Medical Director Garden testified that every medical doctor, registered nurse, and PA at Gunnison had become POST certified. Hennagir does not attempt to controvert this evidence. Instead, she argues that POST certification was not required when she was hired, that she successfully performed her job duties for years without being POST certified, and that the POST certification requirement was added to the PA position in order to qualify for PSR, not because it is

essential.

We begin by noting that the essential function inquiry is not conducted as of an individual's hire date. "The ADA does not limit an employer's ability to establish or change the content, nature, or functions of a job." See Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995). We must look instead to whether a job function was essential at the time it was imposed on Hennagir. See id. We conclude it was.

We weigh heavily the employer's judgment regarding whether a job function is essential. See Mason, 357 F.3d at 1119; 29 C.F.R. § 1630.2(n)(3)(I) (listing "[t]he employer's judgment as to which functions are essential" as a factor to be considered). DOC decision-makers are unanimous regarding the importance of POST certification. As early as 1998, a DOC division director sought to implement POST certification for medical staff because "[t]he institutional setting requires, first and foremost, that all employees have a security mission," and the lack of certification "tends to create a conflict amongst our staff as to who's [sic] responsibility it is to ensure safety and control." Michael Chabries, DOC's Executive Director when the POST certification requirement was implemented, explained that, "like certified corrections officers, the medical staff often had daily, direct inmate contact and thus daily exposure to the myriad risks of working with an inmate population." By enrolling these employees in PSR, Chabries stated, "the Department could require these employees to become

fully trained and certified as peace officers and thus better able to handle, directly, the risks and dangers found at the prison's facilities." Garden opined that "POST certification is important in terms of training, insuring that the staff are not injured, [and] that the staff understand the danger of working in that environment."

Further, the risks involved in direct inmate contact strike at the heart of another factor used to determine whether a job function is essential: the consequences of not requiring an employee to perform the function. See 29 C.F.R. § 1630.2(n)(3)(iv). Sadly, DOC's fears regarding the physical safety of its medical and clinical staff were realized in 1999, when a medical technician was attacked by an inmate during the course of her duties. That incident led the State Risk Management Division to recommend a POST certification requirement. The common sense nature of this recommendation is patent: Because the potential consequences of an inmate attack are severe, it is reasonable to require employees who have direct contact with inmates to undergo training on responding to these dangerous scenarios. Cf. Martinez v. Uphoff, 265 F.3d 1130, 1132 (10th Cir. 2001) (describing the murder of a corrections officer by inmates attempting to escape); Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 275 (10th Cir. 1996) (describing the kidnaping and sexual assault of a prison librarian by an inmate).

Hennagir acknowledges that she spent much of her time meeting with prison inmates, taking their medical histories, and physically examining them.

She contends, however, that she never had to employ emergency training during her eight years at Gunnison, and that other employees have had similar experiences. This argument goes to a number of properly weighed factors: the amount of time spent on the job performing the function, the work experience of past incumbents, and the current work experience of incumbents in similar jobs. See 29 C.F.R. § 1630.2(n)(3)(iii), (vi), (vii). In light of the undisputed evidence described in the preceding paragraphs, however, we find this argument insufficient to create a material issue of fact.

The Sixth Circuit faced a similar set of circumstances when it addressed whether the ability to restrain an inmate was an essential job function of a sheriff's deputy. Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 727 (6th Cir. 2000). As our sibling circuit explained, "Although a deputy [sheriff] may be required physically to restrain inmates only infrequently, the potential for physical confrontation with inmates exists on a daily basis, and the consequence of failing to require a deputy to perform this function when the occasion arises could be a serious threat to security." Id. (citation omitted); see also Frazier v. Simmons, 254 F.3d 1247, 1260 (10th Cir. 2001) ("Even viewing the evidence in the light most favorable to [plaintiff] and assuming that an investigator may be required to perform these physical activities infrequently, the potential for physical confrontation with a suspect exists any time [plaintiff] conducts a crime scene investigation."); 29 C.F.R. pt. 1630, app. ("[A]lthough a firefighter may not

- 13 -

regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious.").  Like the sheriff's deputy in Hoskins, Hennagir came face to face with inmates on a daily basis.  We agree with the Sixth Circuit that, in such circumstances, completion of emergency response training is an essential job function.

**B**

Having concluded that POST certification is an essential job function, "we must determine whether any reasonable accommodation . . . would enable h[er] to perform th[at] function[]."  Wells v. Shalala, 228 F.3d 1137, 1144 (10th Cir. 2000) (citation omitted).  At the summary judgment stage, "the relevant inquiry in determining whether Plaintiff is 'qualified' is whether [s]he has provided evidence that [s]he can be reasonably accommodated—which includes reasonable reassignment—sufficient to require submission to a jury."  Id. (quotation and alteration omitted).

Hennagir's second claim is that DOC failed to reasonably accommodate her inability to become POST certified.  Specifically, she argues that she proposed a number of reasonable accommodations and that DOC's offers in response were unreasonable.  When alleging a failure to accommodate, a plaintiff carries the burden of demonstrating the existence of a facially reasonable accommodation.  Mason, 357 F.3d at 1122.  If a plaintiff clears that initial hurdle, the burden shifts

to her employer to show its inability to provide the requested accommodation. Id. According to Hennagir, she proposed three reasonable accommodations: a waiver of the POST certification requirement, being "grandfathered" into her Gunnison PA position, and an alteration in her job title. We conclude that these proposals are not facially reasonable.

As Hennagir acknowledges, she insisted on an "accommodation" that would permit her to "remain in her position as a PA at [Gunnison]." We have already held that POST certification is an essential job function of that position, yet none of the accommodations described by Hennagir enables such training. Rather, each proposed accommodation, although labeled differently, demands an identical modification: waiver of the POST certification requirement. According to Hennagir, she should be permitted to retain the same job duties (perhaps with a different title) without completing POST certification.

Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "The idea of accommodation is to enable an employee to perform the essential functions of h[er] job; an employer is not required to accommodate a disabled worker by modifying or eliminating an essential function

of the job." Mathews v. Denver Post, 263 F.3d 1164, 1168-69 (10th Cir. 2001).

Under this standard, Hennagir's proposals must fail. See Allmond v. Akal Sec.,

Inc., 558 F.3d 1312, 1318 (11th Cir. 2009) ("[Plaintiff's] only suggestion is to

remove the [essential job function] entirely. That proposal is not reasonable: it

destroys the very standard we have just upheld as a legitimate business

necessity."). Whether one calls it waiver, grandfathering, or a superficial change

in title, Hennagir is requesting that DOC eliminate an essential job function.[3]

Hennagir also argues that DOC refused to engage in an interactive process

to develop a reasonable accommodation. However, we need not determine

whether DOC upheld this obligation. "Even if [an employer] fail[s] to fulfill its

---

[3] Although she does not argue it, Hennagir's request for a title change could
be viewed as a request for reassignment. See 42 U.S.C. § 12111(9)(B)
(describing "reassignment to a vacant position" as possible accommodation).
However, as Hennagir admits, this request would have required the creation of
such a position. "It is not reasonable to require an employer to create a new job
for the purpose of reassigning an employee to that job." Smith v. Midland Brake,
Inc., 180 F.3d 1154, 1174 (10th Cir. 1999) (en banc).
    We emphasize that our review is constrained to the accommodations
proposed by Hennagir because "[t]o defeat an employer's motion for summary
judgment, the employee must first demonstrate that an accommodation appears
reasonable on its face." Mason, 357 F.3d at 1122. Therefore, we do not decide
whether alternative accommodations, such as increased security in the clinic or
restrictions on which inmates Hennagir treats, would be reasonable. We further
stress the peculiar nature of a prison as a workplace in which security is
paramount. We do not suggest that a disabled, world-class neurosurgeon would
not be able to practice medicine in most work environments regardless of her
physical prowess. But because security is essential in a prison, the ADA requires
that neurosurgeon to identify an accommodation that permits her to do her job
safely before invoking its protections.

- 16 -

interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation was possible . . . ." Smith, 180 F.3d at 1174. As explained above, Hennagir has not shown that a reasonable accommodation was possible. Thus, DOC is entitled to summary judgment on Hennagir's reasonable accommodation claim notwithstanding its alleged failure to fulfill its interactive obligation.

C

Hennagir's final claim is that DOC retaliated against her for complaining of discrimination. To establish a prima facie case of retaliation, a plaintiff must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007) (quotation omitted). If a plaintiff establishes a prima facie case, the defendant "has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action." Butler v. City of Prairie Village, Kan., 172 F.3d 736, 752 (10th Cir. 1999). If the defendant can do so, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." Id.

DOC does not contest that Hennagir engaged in protected activities before

filing her retaliation charge with the EEOC; both her internal grievance and her first EEOC charge constitute protected opposition. Thus only the latter two elements are at issue.

Hennagir contends that DOC retaliated against her in three ways: threatening to transfer her to Olympus, lowering her performance evaluation, and "s[eeking] to blame [her] for improper medical care." We hold that none of these actions constituted retaliation on these facts.

The anti-retaliation provision of the ADA, like that of Title VII,

protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) (quotation omitted); see also Proctor, 502 F.3d at 1208 n.4 (adopting White's retaliation standard in the ADA context).

According to Hennagir, DOC retaliated in response to her first internal grievance by "inform[ing] [her] that she must either transfer to the Olympus facility or lose her employment." In the grievance, Hennagir alleged that "[o]n 22 October 2003 I was informed my job may be in jeopardy due to a disability that prevents me from being POST certified." On December 4, the DOC Human Resources Director notified Hennagir that she would have the option of

transferring to Olympus or being terminated. This time line cannot support a retaliation claim. As described by Hennagir, her position as a PA was already threatened at the time she filed the grievance. Thus, the purportedly adverse action taken in retaliation was to supplement this threat of termination with an option for reassignment. It defies logic to conclude that a reasonable worker facing termination might be dissuaded from complaining about that threatened termination because her employer might offer alternative employment. Accordingly, DOC's proposed transfer was not a materially adverse action. See White, 548 U.S. at 68.

Hennagir also argues that a change to her performance evaluation and Garden's "blam[ing]" her for improper medical care constituted retaliation.[4] Even if we assume these actions were "materially adverse," Hennagir fails to create a genuine issue of material fact regarding: (1) a causal connection between her internal grievance and these actions; and (2) whether DOC's proffered reason for changing her evaluation on the heels of learning of her EEOC claim was mere pretext.

Hennagir offers no evidence other than temporal proximity to establish the necessary causal connection. Although "[c]lose temporal proximity between the employee's complaint and the adverse employment action" may be considered in

---

[4] Because her performance evaluation was lowered based on the allegation of improper care, we consider these part and parcel of the same argument.

- 19 -

the retaliation inquiry, Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000), it is clear that, regarding her internal grievance, temporal proximity alone is not sufficient.

Hennagir filed her first internal grievance in November 2003; the complained-of retaliation occurred on April 27, 2004. We agree with the Seventh Circuit, which has explained:

> Although there may be an exception to this general rule [that temporal proximity alone is insufficient] when the adverse action occurs on the heels of protected activity, such a circumstance would be limited to matters occurring within days, or at most, weeks of each other. This can hardly be said to be the case here, where in both circumstances, months separated the alleged protected activity and adverse action.

Mobley v. Allstate Ins. Co., 531 F.3d 539, 549 (7th Cir. 2008) (quotation and citations omitted).

A much stronger temporal connection exists between Hennagir's EEOC charge and the alteration of her evaluation. The Human Resource Director of DOC received notice that Hennagir had filed an EEOC complaint just one day before her revised evaluation was signed. To establish causation in an ADA retaliation action, however, a plaintiff must also demonstrate that the individual who engaged in a materially adverse action knew about the protected activity. Jones v. U.P.S., Inc., 502 F.3d 1176, 1195 (10th Cir. 2007). Here, Garden stated he "honestly [could not] remember when [he] was told" about Hennagir's EEOC claim. Given that DOC was aware of Hennagir's charge, that Garden was

specifically named as a transgressor in the complaint, and that Garden acted the very next day after DOC received the complaint, a reasonable jury could infer that Garden was aware of the EEOC charge on April 27, 2004.

However, DOC offers a legitimate, nondiscriminatory reason for changing Hennagir's evaluation: Gardner believed Hennagir provided a patient with inadequate medical care and that her actions had exposed him and other DOC employees to potential liability. Accordingly, the burden shifts back to Hennagir to produce evidence that this stated reason is mere pretext. Hennagir's only pretext argument is that the allegedly inadequate care occurred more than two years before Gardner requested a change to her evaluation. However, the April 2004 evaluation was Hennagir's first since the patient she allegedly mistreated filed his lawsuit, and thus the first opportunity for that lawsuit to be reflected in her performance evaluations. We accordingly hold that Hennagir has failed to create a material dispute of fact as to pretext. A reasonable jury could not infer—based on timing alone—that DOC's proffered reason for changing Hennagir's evaluation is mere pretext.

For the foregoing reasons, we conclude that Hennagir has failed to establish a genuine issue of material fact on her retaliation claim.[5]

_____

[5] Because Hennagir's Rehabilitation Act claim is derivative of her ADA claims, it necessarily fails as well. See Jarvis v. Potter, 500 F.3d 1113, 1121, 1125 (10th Cir. 2007) (concluding that the standards for discrimination and

(continued...)

- 21 -

**III**

**AFFIRMED**.

---

[5](...continued)
retaliation claims under the Rehabilitation Act are the same as those for discrimination and retaliation claims under the ADA).