**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 24, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

DAVID BRADY THOMAS,

      Plaintiff-Appellant,

v.

AVIS RENT A CAR,

      Defendant-Appellee.

No. 09-4201
(D.Ct. No. 2:07-CV-00705-CW)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **KELLY**, **BRORBY**, and **GORSUCH**, Circuit Judges.

_____

Appellant David Brady Thomas appeals the district court's grant of summary judgment in favor of Appellee, Avis Rent A Car (Avis), on his employment discrimination and retaliation claims related to his hearing impairment and arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000h-6; the Americans with Disabilities Act of 1990 ("ADA" or "the Act"), 42 U.S.C. §§ 12101-12213; and 47 U.S.C. § 225. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. Factual Background

The district court based its summary judgment determination in favor of Avis on various affidavits, depositions, and other attachments submitted in conjunction with Avis's motion for summary judgment and Mr. Thomas's response thereto. Like the district court, we construe the facts contained therein in the light most favorable to Mr. Thomas as the party opposing summary judgment. Our disposition of Mr. Thomas's appeal is based on the following material, undisputed facts and other factual allegations by Mr. Thomas, as indicated hereafter, which, even if construed in the light most favorable to him, are immaterial to our summary judgment determination.

To begin, Avis operates a car rental facility at the Salt Lake City International Airport. Within its facility are two divisions, including "Operations," which encompasses all aspects of the car rental process, and "Maintenance," which handles vehicle maintenance and repair. At all times relevant to this appeal, Frank Jones, in the position designated as Avis "City Manager," oversaw both Avis's Operations and Maintenance divisions at the airport. Other positions within the Operations division included: (1) "Airport Manager," a position held by both Mike Davis and Dennis Erickson; (2) three "Shift Managers" who took turns overseeing eight-hour employee shifts; (3) "Rental Sales Agents" who interacted directly with customers at the rental

counter; (4) "Customer Service Representatives" who worked out of a booth to assist frequent travelers or preferred customers; (5) "Service Agents" who cleaned cars and checked their oil levels; and (6) "Shuttlers" who moved cars between various Avis lots or locations. Similarly, Avis's Maintenance division had its own employee structure, including manager positions, mechanics, technicians, and drivers.

Mr. Thomas is "profoundly deaf," relies on lip reading, text paging, closed caption screens, and relay services for telephone calls, and is considered by both parties as hearing impaired for the purpose of this appeal. In October 1991, he applied for employment with Avis and interviewed with City Manager Jones. Thereafter, Avis hired Mr. Thomas as a Shuttler, where he moved cars between various Avis airport facility lots and locations. A few months later, Avis promoted him to Service Agent, with the responsibility of cleaning cars and checking oil levels.

Shortly thereafter, Mr. Thomas received another promotion to Lead Service Agent, but a few years later, following a series of disciplinary issues, Avis demoted him back to the position of Service Agent. In 2002, Avis again promoted him to Lead Service Agent, where he remained until his termination in 2004. As both a Service Agent and Lead Service Agent, Mr. Thomas reported to

Airport Managers Davis and Erickson, who, in turn, reported to City Manager Jones.

Prior to June 2004, Mr. Thomas received discipline for misconduct on at least twenty separate occasions, including insubordination, harassing co-employees, safety violations, abuse of company property, quality control issues, and attendance problems. In addition, as Mr. Thomas conceded, Airport Manager Davis viewed him as lacking interpersonal skills, and in several instances, as part of the disciplinary process, Mr. Davis pointed out to Mr. Thomas his difficulty interacting with people and questioned his ability to be a manager.

In June 2004, Avis posted an opening for a Shift Manager, which required significant face-to-face customer service and responsibilities such as addressing customer inquiries and complaints and directly supervising and interacting with other employees, including Rental Sales Agents and Service Agents. To be considered for Shift Manager, Avis recommended applicants have either a college degree or extensive rental car experience with a customer service background, and, in almost all instances, successful applicants for the Shift Manager position had previously been employed as Rental Sales Agents or Customer Service Representatives. According to Mr. Erickson, in his twenty-seven years of

employment with Avis, he recalled only one instance where Avis directly promoted someone from Service Agent to Shift Manager.

Sometime prior to the posting of the Shift Manager position, Mr. Thomas informed Airport Manager Erickson of his interest in becoming a Shift Manager, which led Mr. Erickson to suggest he first apply to be a Customer Service Representative to acquire customer service experience and thereafter apply for a Rental Sales Agent position – a career path similar to the one Mr. Erickson took. Mr. Erickson also identified available Customer Service Representative positions for which he recommended Mr. Thomas apply. Likewise, City Manager Jones and Airport Manager Davis told Mr. Thomas he should apply for the next available Customer Service Representative position. However, Mr. Thomas never applied for such a position or the position of Rental Sales Agent. When Mr. Erickson asked him why he did not apply for one of the openings brought to his attention, Mr. Thomas responded he had no desire to be a Customer Service Representative and, instead, wanted to move directly to Shift Manager.

Mr. Erickson also suggested that if Mr. Thomas wanted to move into management, he should explore opportunities in Maintenance, including applying for an open "PM Technician" slot as a first step toward becoming a "Maintenance Manager." Mr. Erickson further discussed the topic with City Manager Jones,

who also believed Mr. Thomas should pursue career opportunities on the Maintenance side, where he thought Mr. Thomas could do well, and stated he was concerned about Mr. Thomas's communication skills, given his inability to pronounce words well and customers' capacity to get upset. Airport Manager Davis also encouraged Mr. Thomas to pursue a position in Maintenance, including the PM Technician position. While Mr. Thomas did apply for the PM Technician position, he turned the position down when it was offered to him, telling Mr. Erickson he did not want to rotate tires and hurt his back.[1]

Once Avis posted the Shift Manager position in June 2004, Mr. Thomas applied. City Manager Jones and Airport Manager Davis interviewed him for the position.[2] During his interview for employment, Mr. Jones again suggested Mr.

_____

[1] Mr. Thomas also unsuccessfully proposed to Mr. Jones and Mr. Davis that Avis create a new position of lot manager which would permit him to gain managerial experience, focusing his attention on employees rather than customers. On appeal, he acknowledges Avis had no obligation to create a new position for him as part of the reasonable accommodation interactive process, and thus, we need not concern ourselves with this issue on appeal.

[2] While Mr. Thomas also claims "too many people" told him he could not be Shift Manager because of his inability to hear on the telephone, he nevertheless applied for the position and fails to identify who made these statements prior to his applying for the position. "[M]ere conclusory allegations are insufficient to establish an issue of fact under Fed. R. Civ. P. 56." *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). Even where an affidavit or deposition is based on personal knowledge and sworn, it may be insufficient to create a triable issue of fact if, as here, it is non-specific or otherwise non-responsive, vague, conclusory, or self-serving. *See Salguero v.*

(continued...)

Thomas pursue management opportunities in the Maintenance division or pursue a position as a Customer Service Representative. Ultimately, Avis hired another individual for the position. Mr. Thomas does not dispute the successful applicant possessed a college degree, previously worked as a Rental Sales Agent, and had significant management experience; nor does he contend he was more qualified for the Shift Manager position.

On July 26, 2004, Mr. Thomas contacted the Avis Regional Manager, Jeff Eisenbarth, stating he believed his advancement was blocked because of his disability and he had been told he could not be a Rental Sales Agent because of his deafness. Mr. Thomas asserted he could assist and communicate with customers if another manager was present who could answer all customer inquiries via the telephone. However, according to Mr. Thomas, Mr. Eisenbarth also questioned Mr. Thomas about his ability to communicate over the telephone and agreed pursuing a management position in Maintenance might be a better fit for him.

In August 2004, when Geoff Danheiser, Avis's Human Resources Manager, visited the airport facility, Mr. Thomas also asked him why he had not been

---

[2](...continued)
*City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004) (relying on *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995)).

selected for the Shift Manager position, stating he thought it might be because of his hearing impairment, to which Mr. Danheiser explained Avis hired the other person because he possessed superior qualifications. Mr. Thomas again stated his belief he was denied the position because of his disability and again asserted he could assist and communicate with customers if another manager was present who answered all customer inquiries via the telephone. According to Mr. Thomas, he also told Mr. Danheiser he felt like he was being denied any position and wanted to work as a Rental Sales Agent or Customer Service Agent but it did not happen. In response, Mr. Danheiser allegedly told him he could not work with customers or co-employees in either position due to his deafness because he would have to face customers when talking to them rather than listening to them while on the computer, he might scare customers away, and his disability would be unfair to other employees who would have to answer the telephone.

Months later, on November 5, 2004, Shift Manager Anthony Gillette received word a customer left an item in a recently returned car, and when he attempted to locate the keys to the car, Mr. Thomas inquired and received information from Mr. Gillette on the car in question. Mr. Thomas indicated he may have cleaned that car, left to look for the item, and returned with it – a bag with a hat inside. However, pursuant to Avis's longstanding written policy, of which Mr. Thomas was aware, any item left in a rental car by a customer is

classified as lost and found.  After finding such an item, Service Agents are required to immediately fill out a company tag listing detailed information, including information on the vehicle and the customer's name, and deposit the item and tag in the lost and found box.  According to Avis's policy, of which Mr. Thomas was also aware, lost and found items are a significant issue and violation of the written lost and found policy is a terminable offense.  In fact, Airport Manager Erickson had never recommended a penalty other than termination for such an offense.

Shift Manager Gillette immediately suspended Mr. Thomas pending an investigation into his violation of Avis's lost and found policy.  In an e-mail to Mr. Jones concerning the incident Mr. Gillette accused Mr. Thomas of hiding the hat and informed Mr. Jones that he was suspending Mr. Thomas pending an investigation.  A few days later, on November 10, 2004, the Utah Anti-Discrimination and Labor Division of the Utah Department of Employment mailed Avis materials relating to a Charge of Discrimination filed by Mr. Thomas, alleging Avis failed to hire him as Shift Manager due to his hearing impairment.  At the time Mr. Gillette suspended Mr. Thomas, neither he nor anyone at Avis was aware of this charge of discrimination.

In a statement dated November 12, 2004, Mr. Thomas admitted not turning in the bag and hat because he forgot. The same day, City Manager Jones, Airport Manager Davis, and Avis Security Manager Jack Bencale met with Mr. Thomas to discuss his suspension pending Avis's investigation into his violation of the lost and found policy; Human Resources Manager Danheiser also attended the meeting by telephone. At or prior to the meeting, Mr. Thomas claims he unsuccessfully requested a third-party interpreter and permission to tape the meeting; although his requests were denied, Mr. Thomas recorded the meeting anyway. During the meeting, Mr. Thomas admitted he knew company policy required he fill out a tag and turn in the customer's item immediately but that he failed to turn in the bag with the hat because he "forgot."

On November 17, 2004, five days after his meeting with Avis supervisors, Mr. Thomas amended his Charge of Discrimination to allege retaliation, which was mailed to Avis's office in Denver, Colorado, rather than to Avis's Salt Lake City Office. Two days later, on November 19, 2004, City Manager Jones sent Mr. Thomas a letter, articulating Avis's policy that theft or failure to immediately turn in lost and found items may result in immediate termination of employment and informing him of his termination from employment based on his violation of that policy. At the time of Mr. Thomas's suspension and termination, Airport Manager Erickson was out of town.

## II.  Procedural Background

On September 20, 2007, Mr. Thomas filed his federal civil rights complaint, alleging Avis discriminated and retaliated against him on the basis of his disability, in violation of the ADA.  Following discovery, briefing on Avis's motion for summary judgment, and presentation of the parties' arguments at a hearing on the motion, the district court granted summary judgment in favor of Avis on all claims, for the reasons articulated hereafter.  This appeal followed, in which Mr. Thomas reasserts his discrimination and retaliation claims.  In his discrimination claim, Mr. Thomas contends Avis denied him reasonable accommodation and took discriminatory adverse action against him by terminating him, attempting to segregate him from customers, and creating a hostile work environment.  In his retaliation claim, he asserts Avis retaliated against him when its employees "coerce[d]" him into pursuing a management position in Maintenance and suspended, investigated, and fired him on "trumped up allegations."

## III.  Discussion

### A.  Standard of Review

We review *de novo* the district court's summary judgment decision and "consider the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences from the available underlying facts." *Jaramillo*

*v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (*en banc*) (*per curiam*) (quotation marks omitted).  Summary judgment is appropriate if the record shows "there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 (10th Cir. 2009); *see* Fed. R. Civ. P. 56(a).  In reviewing summary judgment motions, the movant for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).

If this initial burden is carried, the non-movant may not rest solely on his pleadings but must set out specific facts in support of his claims by reference to affidavits, deposition transcripts, or other exhibits incorporated therein.  *See id.* at 671.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," and, instead, summary judgment requires "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While we view the evidence and draw inferences in the light most favorable to the non-moving party, that party must identify sufficient evidence which would require submission of the case to a jury.  *See Adler*, 144 F.3d at 671-72 & n.1.  In addition, "[w]e may

-12-

affirm the district court for any reason supported by the record." *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) (quotation marks omitted).

## B.  Disability Discrimination Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of the disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To prevail on a disparate treatment or discrimination claim under the ADA, an employee must show the employer "intentionally discriminated against him for a reason prohibited by the Statute." *Jaramillo,* 427 F.3d at 1306.  In so doing, an employee must establish:  (1) he is a disabled person as defined by the Act; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) his employer discriminated against him because of his disability. *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005).  On appeal, the parties do not dispute the fact Mr. Thomas is disabled due to his deafness for the purposes of the ADA, leaving for consideration only the issues of whether Avis failed to provide him reasonable accommodation to perform the essential functions of the job held or desired and discriminated against him because of his disability.

If, as here, the employee relies on circumstantial evidence in an attempt to meet the required criteria, "we apply the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Jaramillo*, 427 F.3d at 1306. Under this analysis, if the employee establishes a prima facie case of discrimination, then "a presumption of discrimination arises," resulting in the burden shifting to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 1307. "If the [employer] carries its burden of production, the presumption of discrimination drops out of the case," and "[t]he burden then shifts back to the [employee], who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination." *Id.*

An employee can demonstrate pretext "by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1308 (quotation marks omitted). We have said "[e]vidence of pretext may include prior treatment of [the employee]; the employer's policy and practice ...; disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria." *Id.* (quotation marks omitted).

-14-

As previously indicated, under the ADA, the employer must make an effort to accommodate an employee's disability. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1265 (10th Cir. 2010). We have said "[t]here are two components to the reasonable accommodation analysis," including whether a reasonable accommodation would enable the employee to do the particular job and whether the employee could be transferred to other work which could be done with or without accommodation. *Id.* (quotation marks omitted). As part of the accommodation process, we have said "[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Id.* (quotation marks omitted). "The idea of accommodation is to enable an employee to perform the essential functions of his job; an employer is not required to accommodate a disabled worker by modifying or eliminating an essential function of the job." *Mathews v. Denver Post*, 263 F.3d 1164, 1168-69 (10th Cir. 2001).

On appeal, Mr. Thomas claims Avis failed to provide him reasonable accommodation as required under the ADA because it failed to: (1) determine if he could interact with customers if given reasonable accommodation; or (2) provide a third-party interpreter or allow his participation in an interactive process at his termination meeting. However, in awarding summary judgment to Avis on this issue, the district court determined Mr. Thomas presented no

evidence he needed an accommodation in his existing position as a Service Agent, which he performed successfully for a number of years without complaint or a request for accommodation. We agree. Furthermore, to the extent Mr. Thomas is somehow making an accommodation claim with respect to the position of Shift Manager, for which he applied, nothing in the record demonstrates he requested an accommodation for his disability when he applied for that position. Similarly, to the extent his statements to Mr. Danheiser and Mr. Eisenbarth were requests for accommodation (in which Mr. Thomas stated he could assist and communicate with customers if another manager was present and could communicate with customers on the phone), these conversations occurred after Avis filled the position of Shift Manager with another, qualified individual, and Mr. Thomas never applied for any other customer service positions in Operations for which such an accommodation request would apply. Finally, Avis was under no obligation to employ two Shift Managers during an eight-hour shift merely to accommodate Mr. Thomas's proposal he could perform as a Shift Manager if another manager was on duty. *See id*.

Similarly, with regard to his request for accommodation by use of an interpreter and his alleged inability to participate in an interactive process at his termination meeting, we agree with the district court that Mr. Thomas failed to present any evidence to show a causal connection between those circumstances

and the decision to terminate him for violation of Avis's lost and found policy. Instead, as the district court explained, he failed to present any evidence showing an interpreter or his increased participation at the termination meeting would have changed the result, either with regard to his response to breaking company policy or in Avis terminating him for breaking that policy. Thus, none of Mr. Thomas's allegations rise to an actionable claim for accommodation under the ADA or otherwise fit within the criteria required to make an accommodation claim.

Next, even if Mr. Thomas was qualified, with or without reasonable accommodation, to perform the essential functions of the job he held or desired, he claims Avis discriminated against him based on his disability. In support, he suggests Avis impermissibly discriminated against him when it terminated him; sought to segregate him from customers in Operations; discouraged him from pursuing a position in Operations which dealt directly with customers, including telling him he could not be a Customer Service Representative or Rental Sales Agent; and "created a way to terminate him" after he failed to move to Maintenance. He claims Avis terminated him even though his managers: (1) knew he did not conceal or intend to conceal the hat; (2) failed to review video surveillance recordings which would have shown whether he hid the hat; and (3) failed to consult with Airport Manager Erickson who was his direct supervisor.

He also claims Avis discriminated against him by creating a hostile work environment.

The district court rejected Mr. Thomas's allegation Avis impermissibly discriminated against him by terminating him based on his disability, pointing out the company's policy and practice in terminating employees for failing to immediately tag and turn in lost and found items was clear and undisputed; it never deviated from it; Mr. Thomas admitted he was aware of such a policy; and that given Avis's practice of terminating employees violating the policy, it did not matter whether Avis believed Mr. Thomas intended to hide or steal the hat. It also held Mr. Thomas failed to establish Avis's termination of Mr. Thomas for violation of the lost and found policy was a pretext for unlawful discrimination, as no evidence showed its underlying reason for his termination was his disability or that a connection otherwise existed between his termination and disability. In making this determination, the district court rejected Mr. Thomas's argument Avis fired him because he applied for and failed to get the Shift Manager position, stating, "I don't think that's a reasonable inference to say that they terminated him because they were unhappy that he applied and didn't get a job."

We agree with the district court's assessment. Even if Mr. Thomas met his burden for the purpose of creating a presumption of discrimination, Avis carried

-18-

its burden of articulating a legitimate, non-discriminatory reason for the adverse employment action when it stated Mr. Thomas's termination stemmed from his violation of its mandatory lost and found policy which required strict adherence in tagging and turning in lost and found items and its practice of terminating employees who violated that policy, of which Mr. Thomas admitted he was aware. Because Mr. Thomas admitted to failing to follow that policy when he forgot to turn in the customer's property, it is irrelevant whether: (1) Mr. Gillette falsely accused him of hiding or stealing the hat or others believed he did not intend to steal it; (2) Avis managers failed to view the surveillance video; or (3) Avis failed to consult with Mr. Thomas's other supervisor, Mr. Erickson, who, in any event, was out of town during the circumstances surrounding Mr. Thomas's suspension and termination and had never recommended a penalty other than termination for violation of the lost and found policy.

Once Avis carried its burden of production on that issue, the presumption of discrimination evaporated and the burden shifted back to Mr. Thomas to prove by a preponderance of the evidence Avis's reason for termination was a mere pretext for unlawful discrimination. Mr. Thomas failed to present any evidence to meet that burden, including any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Avis's proffered legitimate reason. *See Jaramillo,* 427 F.3d at 1308. Instead, the evidence presented established Avis,

based on both policy and practice, immediately and consistently terminated all other employees violating the same policy. Mr. Thomas's mere allegation of discrimination based on his disability or his failure to obtain a different position in the company is not enough to carry his burden, especially given his admission he was not more qualified than the person who obtained the position. *See id.* at 1308-09 (holding "minor differences between [an employee's] qualifications and those of a successful applicant are not sufficient to show pretext").

Turning to Mr. Thomas's allegation Avis impermissibly discriminated against him through disparate treatment because its employees sought to segregate him from customers in Operations, he failed to raise this issue before the district court, either in his complaint or his argument in opposition to summary judgment. However, even if we give Mr. Thomas the benefit of addressing his newly-raised contention,[3] nothing in the record establishes Avis employees impermissibly attempted to "segregate" him or otherwise discourage him from pursuing positions in Operations where he would deal directly with its customers. On the contrary, when Mr. Thomas presented his desire to become a Shift Manager, his

---

[3] "We consider each case individually in determining whether to exercise our discretion to consider a question raised for the first time on appeal" and have held "[s]uch determination must begin with recognition that sound policy supports the proposition that an appellate court will not consider an issue raised for the first time on appeal." *Gorman v. Carpenters' & Millwrights' Health Benefit Trust Fund*, 410 F.3d 1194, 1202 (10th Cir. 2005).

direct supervisors – Mr. Davis, Mr. Erickson, and Mr. Jones – suggested he apply to be a Customer Service Representative to acquire customer service experience. Mr. Erickson further pointed out that if he obtained such a position, the next step would be to apply for a Rental Sales Agent position – a career path similar to the one Mr. Erickson took and recommended for persons seeking the Shift Manager position within the Operations division.

Even when Mr. Erickson identified available Customer Service Representative positions for which he recommended Mr. Thomas apply, Mr. Thomas never applied for such a position or for a position as a Rental Sales Agent. To the extent Mr. Danheiser told him he could not hold a position interacting with Avis customers, nothing in the record shows Mr. Danheiser's discussion with Mr. Thomas, which occurred after the Shift Manager position was filled, was the cause of Mr. Thomas not obtaining that position or his eventual termination.

Similarly, while Avis managers also encouraged Mr. Thomas to pursue a technician position in Maintenance, where they thought he would be more successful in pursuing a management position, such encouragement came after they discussed Mr. Thomas pursuing the positions of Rental Sales Agent or Customer Service Agent as a means to advance in Operations, in which he

-21-

indicated a disinterest. Thus, during the time in question, Mr. Thomas continued in his position as a Service Agent based on his own decision not to apply for the positions of Rental Sales Agent or Customer Service Agent and not because of any disparate treatment by Avis in impermissibly "segregating" him from such positions or its customers. More importantly, even if Mr. Thomas's "segregation" claim rose to a prima facie case of discrimination, he has not carried his burden to show Avis's articulation of a legitimate, non-discriminatory reason for his termination based on its zero-tolerance lost and found policy was merely a pretext for his termination or that his termination was otherwise based on his disability.

Finally, Mr. Thomas claims Avis discriminated against him by creating a hostile work environment where managers disparaged his abilities based on his deafness, tried to alter his conditions of employment by directing him to work in Maintenance, and conducted a "hostile and demeaning interrogation" during his termination meeting. According to Mr. Thomas, Avis created a hostile and demeaning interrogation at his termination meeting when the Avis managers talked amongst themselves without him being able to lip read or comprehend their conversations. While Avis concedes that at one point during the interview, Security Manager Bencale, who was questioning Mr. Thomas, may have been in close proximity to him, causing Mr. Thomas to ask him to "please step back away" from him as it was "not professional," it nevertheless contends Mr.

-22-

Thomas has not carried his burden in establishing a hostile work environment existed.

In evaluating a hostile work environment claim, we examine all the circumstances, including: (1) the frequency of the discriminatory misconduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening and humiliating or merely an offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's work performance. *See MacKenzie* 414 F.3d at 1280. Thus, to successfully pursue a hostile work environment claim, an employee must show his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment ...." *Id.* (quotation marks omitted). In addition, while Mr. Thomas may have somehow subjectively perceived the Avis managers' comments and suggestions as creating such a hostile environment, "the environment must be both subjectively and objectively hostile or abusive," *id.*, so that it is "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In considering whether a reasonable person would find his work environment hostile, we have said the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which

-23-

are not fully captured by a simple recitation of the words used ....” *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998) (applying social impact in sexual harassment claim).

In determining Mr. Thomas failed to present evidence in support of his hostile work environment claim, the district court noted the Avis managers, in discussing Mr. Thomas's future career route in either Operations or Maintenance, merely tried to explain to him, based on his skill set and ability, that they did not think he would be successful if he pursued *his desired route* in applying directly for Shift Manager, and simply tried to advise him how he would most likely succeed in advancing to a management position. It held such statements were insufficient to meet the legal standard for a hostile work environment, including any showing of frequent discriminatory misconduct which was severe, physically threatening, or humiliating; which unreasonably interfered with his work performance; or which otherwise changed the condition of his employment in the position held. As a result, the district court determined Mr. Thomas failed to show the environment created by management's suggestion was so bad “that he [couldn't] do the existing job.” Similarly, with regard to an interpreter, the district court held that even if Mr. Thomas unsuccessfully requested an interpreter in his termination meeting, it did not rise to a level of persistent, on-going offensive behavior creating a hostile work environment. We agree.

In this instance, none of the career path suggestions Avis managers made, when considered in context with the circumstances surrounding those suggestions, created an environment which a reasonable person would find hostile or abusive or would otherwise believe amounted to discriminatory changes in the terms and conditions of employment. *See Faragher*, 524 U.S. at 787-88. As the district court explained, Mr. Thomas's managers simply provided advice as to how they believed he could successfully advance into a management position after he approached them with his unrealistic expectation of advancing directly to Shift Manager without the requisite education or customer experience.

Similarly, neither the lack of an interpreter nor the other circumstances surrounding Mr. Thomas's termination meeting rise to an actionable hostile environment claim. Nothing in the record establishes the lack of an interpreter unreasonably interfered with his work performance or otherwise changed the condition of his employment, especially given his admission at the meeting to violating Avis's zero-tolerance lost and found policy, from which his termination stemmed. Furthermore, even though Mr. Thomas tape recorded his termination meeting, he fails to provide evidence establishing a "hostile and demeaning interrogation" occurred or that the circumstances presented otherwise met the criteria of a hostile work environment actionable under the ADA. More specifically, even if Avis managers: (1) talked amongst themselves without him

being able to lip read or comprehend their conversations at his termination meeting; (2) terminated him for his admission to violating its zero-tolerance lost and found policy even though they knew he did not conceal or intend to conceal the hat; or (3) acted unprofessionally by being in close proximity to Mr. Thomas during the meeting, these circumstances do not rise to the requisite level or type of severe and pervasive physically threatening or humiliating conduct sufficient for a claim. For all of these reasons, we agree with the district court that no genuine issue exists as to any material fact on Mr. Thomas's discrimination claim, and Avis, as the moving party, is entitled to judgment as a matter of law.

## C. Legal Standard on Retaliation

On appeal, Mr. Thomas continues to claim Avis retaliated against him by firing him for complaining about its discriminatory action against him when he failed to obtain the Shift Manager position.[4] To establish retaliation, an employee

---

[4] On November 6, 2004, one day after his suspension, Mr. Thomas contacted Airport Manager Erickson, telling him he intended to call the Avis "Integrity Hotline" to report Mr. Gillette for allegedly stealing gas. Not only do the vehicles contain anti-siphoning devices, but Mr. Erickson questioned why Mr. Gillette would steal gas when it was a benefit he received as an Avis manager; nevertheless, he advised Mr. Thomas to address the issue with Airport Manager Davis or City Manager Jones. When Mr. Thomas stated he wanted to bypass management and call the Integrity Hotline instead, Mr. Erickson told him he could not discourage him from that course of action and left the decision up to him.

Two days later, on November 8, 2004, an anonymous caller telephoned the
(continued...)

must show: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *See Hennagir,* 587 F.3d at 1265. The burden shifting analysis for retaliation is similar to that for proving a claim for discrimination. If an employee establishes a prima facie case of retaliation, the employer "has the burden of coming forth with a legitimate, nondiscriminatory reason for adverse action." *Id.* (quotation marks omitted). If the employer carries that burden, the burden shifts back to the employee to show "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." *Id.* (quotation marks omitted).

In applying these principles, the district court granted summary judgment to Avis on Mr. Thomas's retaliation claim, explaining it was undisputed the decision to suspend Mr. Thomas pending an investigation came before anyone at Avis was

---

[4](...continued)
Integrity Hotline, accusing Mr. Gillette of improperly siphoning gasoline from Avis cars for personal use and stating the call was made on behalf of a hearing-impaired thirteen-year Avis employee. Avis responded by promptly investigating the allegations, including interviewing Mr. Thomas, but ultimately cleared Mr. Gillette of any wrongdoing. To the extent Mr. Thomas's retaliation claim relates to his complaint about Mr. Gillette, he has offered no evidence in support thereof, especially in light of Avis's legitimate, non-discriminatory reason for terminating him, as discussed hereafter.

aware of Mr. Thomas's formal Utah discrimination claim. It also determined that while Mr. Thomas verbally complained to Regional Manager Eisenbarth and Human Resources Manager Danheiser about not being selected for the position of Shift Manager because of his disability, no evidence existed from which one could reasonably infer a connection between his termination and those earlier complaints, even if they were a protected activity. Instead, the district court determined Mr. Thomas failed to provide evidence showing the person making the decision to terminate him knew of any of these complaints or that they were otherwise related to the decision to terminate him.

We agree. Even if Mr. Thomas's allegations somehow did rise to a prima facie case of retaliation, Avis met its burden of providing a legitimate, nondiscriminatory reason for its adverse action when it explained he violated its lost and found policy which, without exception, resulted in termination of all other employees who violated it. As Avis contends, Mr. Thomas admitted he violated that policy and knew of the consequences for such a violation. Once Avis carried its burden of providing this legitimate, non-discriminatory reason for his termination, the burden shifted back to Mr. Thomas to show the reason given was mere pretext for the real discriminatory reason for the adverse action, which he failed to do. In making this pretext determination, we examine the facts as they appeared to the Avis manager making the decision to terminate Mr. Thomas,

-28-

*see Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001), and "may not act as a super personnel department that second guesses employers' business judgments," *Jaramillo*, 427 F.3d at 1308 (quotation marks omitted). Thus, we may not determine if it was an unwise, unfair, or incorrect decision; instead, we look to whether the employer honestly believed the reason given and acted in good faith on that belief. *See Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004). In this instance, Mr. Thomas admitted to violating Avis's lost and found policy on which City Manager Jones honestly relied and acted in good faith in terminating him. Nothing about the circumstances presented is sufficient to successfully pursue a claim of retaliation.

Applying our *de novo* review to the district court's summary judgment decision, and after considering the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences from the available underlying facts, we conclude no genuine issue as to any material fact exists with respect to Mr. Thomas's discrimination or retaliation claims. Accordingly, we agree with the district court that Avis, as the moving party, is entitled to judgment as a matter of law on all claims included in its motion for summary judgment.

## IV. Conclusion

For the reasons cited herein, we **AFFIRM** the district court's summary judgment decision in favor of Avis.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge