FILED
United States Court of Appeals
Tenth Circuit

**July 10, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff - Appellant,

v.

THE PICTURE PEOPLE, INC.,

     Defendant - Appellee.

------------------

UNIVERSITY OF MARYLAND
FRANCIS KING CAREY SCHOOL
OF LAW CIVIL RIGHTS OF
PERSONS WITH DISABILITIES
CLINIC; NATIONAL ASSOCIATION
OF THE DEAF,

     Amici Curiae.

No. 11-1306

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CV-02315-PAB-CBS)**

---

Susan Oxford, (P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting
Associate General Counsel and Lorraine C. Davis, Assistant General Counsel of
the Equal Employment Opportunity Commission, on the briefs), Washington,
D.C., for Plaintiff - Appellant.

Merrily Archer of Hall & Evans, L.L.C., Denver, Colorado, for Defendant -

Appellee.

Marc Charmatz, Adjunct Professor of Civil Rights of Persons with Disabilities Clinic, University of Maryland Francis King Carey School of Law, Baltimore, Maryland; Marc Charmatz and Debra Patkin of National Association of the Deaf, Silver Spring, Maryland, on the brief, for Amici Curiae.

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiff-Appellant, Equal Employment Opportunity Commission ("EEOC"), on behalf of Jessica Chrysler ("Employee"), appeals from the district court's grant of summary judgment in favor of Defendant-Appellee, The Picture People ("Employer"). See Order Granting Summary Judgment, EEOC v. Picture People, Inc., No. 09-cv-02315-PAB-CBS, 2011 WL 1754522 (D. Colo. May 9, 2011) (hereinafter "Order"). The district court granted summary judgment on the basis that Employee could not establish an essential element of her case, that she was qualified—with or without accommodation—to perform an essential function of her job as a "performer" in Employer's store. Id. at *3-*5. It also concluded that Employee's retaliation claim failed because she could not perform an essential function of the job, and that she offered no evidence that Employer's legitimate, non-discriminatory reasons were pretextual. Id. at *7-*8. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## Background

Employee is a congenitally and profoundly deaf individual who communicates with hearing individuals by writing notes, gesturing, pointing, and miming. She can also type, text message, and use body language. According to the EEOC, "[s]he also uses basic American Sign Language ("ASL") signs that most people can understand and speaks some words." Aplt. Br. 4. Employer maintains that Employee "cannot read lips effectively, nor can she speak except for a few words." Aplee. Br. 8. It also claims that Employee's written communication skills are poor and that she scored below average on vocational tests administered by EEOC's expert—Michael Newman. Aplt. App. 310a. On October 23, 2007, Employer hired Employee to work in its Littleton, Colorado store as a "performer." Id. at 388a. Employee's interview occurred in writing because she was not able to meaningfully participate in a group interview with four other prospective employees. Id. at 311a-14a, 458a. Performers have four areas of responsibility: customer intake, sales, portrait photography, and laboratory duties. Id. at 100a-01a. During peak (holiday) periods, the employer hires "seasonal" performers who are scheduled to work in one of the four "zones" of responsibility listed above. Aplee. Br. 7-8; Aplt. App. 98a, 207a. Arnold Aguilar, Employer's studio manager, hired Employee to work primarily in the camera room doing photography. Aplee Br. 7-8. During non-peak periods, Employer schedules only one manager and one performer to work at a time,

termed "2-2 staff coverage." Id. at 8; Aplt. App. 337a. When 2-2 staff coverage is used, "each Performer must be able to perform all four essential functions of the Performer job . . . ." Aplee Br. at 8; Aplt. App. 337a; Order at *1.

Employee requested an ASL interpreter for her three days of orientation training. Order at *1. Employer was unable to supply an interpreter, and Employee's start date was delayed by three weeks. Id.; Aplt. Br. 5. Eventually, Employee secured an interpreter through the Colorado Division of Vocational Rehabilitation ("DVR"), which had been assisting with her job search. Order at *1.

Employee had the opportunity to shoot photographs on 15-20 occasions with a hearing performer; she attempted to conduct a shoot by herself on a couple of occasions. Aplt. App. 247a. Employee communicated with subjects by writing notes, gesturing, and miming. Id. at 240a-47a. This was often difficult as photo subjects are usually young children. In order to sell photo packages, Employee had to write notes, gesture, or "get somebody else that could do it more efficiently . . . ." Id. at 236a.

In November 2007, Employer dispatched Master Photographer Libby Johnston to the Littleton store to improve photography quality and sales in anticipation of the holidays. Order at *2. Ms. Johnston provided a training session. The EEOC maintains that Employee requested an ASL interpreter, but none was provided. Aplt. Br. 7. At any rate, Ms. Johnston "found [Employee's]

- 4 -

written communications awkward, cumbersome, and *impractical . . . .*" Aplee. Br. 17; Aplt. App. 164a. She telephoned the District Manager, Candi Bryan; they conferred and recommended that Employee be reassigned exclusively to the photo lab. Order at *2. Thereafter, Employee was assigned almost exclusively to the lab. Id.

After the 2007 holiday season, Employer instructed the local acting studio manager to cut the hours of or terminate seasonal performers. Id. Employee complained about her hours, and management explained in writing that all performers' hours had been cut. Aplt. App. 336a-39a. On December 29, 2007, management notified Ms. Bryan that Employee's performance in the lab was deteriorating—Employee was coloring with pencils instead of working, refusing to take legally required rest breaks, and demanding hours with threats, when all Performers' hours were cut. Id. at 340a. With the assistance of the human resources department, Ms. Bryan prepared a Performance Track Counseling statement to put Employee on notice of performance problems. Id. at 341a-42a. Ms. Bryan also requested a meeting with Employee on January 9, 2008, to administer a counseling statement. The EEOC characterizes the notice as reprimanding Employee for the performance deficiencies, and for becoming "angry" and "threaten[ing] to bring a grievance . . . when [she] did not get her hours increased." Aplt. Br. 10-11; Aplt. App. 341a-42a.

After the 2007 holiday season, Employee remained on the schedule as an

- 5 -

employee, but was not scheduled to work.  Order at *2.  Employer officially terminated Employee in October 2008.  Aplt. Br. 15.

In September 2009, the EEOC filed this action alleging that Employer violated the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101.  Aplt. App. 7a-18a.  After discovery, Employer moved for summary judgment on all claims, and the EEOC moved for partial summary judgment on four of Employer's affirmative defenses.  On May 9, 2011, the district court granted Employer's motion to withdraw its affirmative defenses, ruled the EEOC's motion moot, and granted Employer's motion for summary judgment.  See Order.  This appeal followed.

Discussion

We review the district court's grant of summary judgment de novo.  Fowler v. United States, 647 F.3d 1232, 1237 (10th Cir. 2011).  A prima facie case of disability discrimination under the ADA requires that the Employee (1) be a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.  See EEOC v. C.R. England, Inc., 644 F.3d 1028, 1037-38 (10th Cir. 2011).

The parties agree that Employee was disabled within the meaning of the

ADA.  See Order at *1.  Therefore, we start with the second part of the test.

I.      Was Employee Qualified for the Performer Position?

Under the ADA, it is unlawful for an employer to use qualification standards, employment tests, or other selection criteria that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity . . . ." 42 U.S.C. § 12112(b)(6); 29 C.F.R. § 1630.15(b)(1).  An employer must make "reasonable accommodations" for an otherwise qualified individual unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.15(d).

A.      Are Verbal Communication Skills an Essential Function of the Performer Position?

Employer maintains that strong verbal communication skills are an essential function of the performer position.  Whether such skills are an essential function depends in part upon whether Employer "actually requires all employees in the particular position to satisfy the alleged job-related requirement." Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1262 (10th Cir. 2009).  If so, the next inquiry is whether verbal communication skills are fundamental to the performer position.  Factors to consider are:

(I)     The employer's judgment as to which functions are essential;
(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)   The amount of time spent on the job performing the function;
(iv)    The consequences of not requiring the incumbent to perform the function;
(v)     The terms of a collective bargaining agreement;
(vi)    The work experience of past incumbents in the job; and/or
(vii)   The current work experience of incumbents in similar jobs.

Id.; 29 C.F.R. § 1630.2(n)(3). The essential function analysis "is not intended to second guess the employer or to require [it] to lower company standards . . . . Provided that any necessary job specification is job-related, uniformly enforced, and consistent with business necessity, the employer has a right to establish what a job is and what is required to perform it." Hennagir, 587 F.3d at 1262 (internal quotations omitted); cf. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1191 (10th Cir. 2003) (stating that evidence of what an employer thinks is an essential job function is important, but not conclusive).

Using the criteria listed above, verbal communication skills are an essential function of the performer position. Employer explains that a performer must be able to verbally communicate with customers (many of whom are children), Aplt. App. 53a, and it lists "[s]trong verbal communication skills" and "[s]trong customer service skills" as job qualifications for the performer position. Aplt. App. 98a-99a, 155a-56a. According to Employer, "substituting written notes, gestures, and pointing for fast, efficient verbal cuing in the Camera Room is

- 8 -

simply impractical in light of (a) the short attention span of most Picture People subjects . . . ; (b) the interruption to the flow of the photo shoot; (c) the inability to establish rapport with the parent and child and finally, (d) the quick 20-minute duration of each Camera Room sitting[.]" Aplee. Br. 16.

Employee is unable to fully perform three of the four duties of a performer. Although she can fully perform the lab function, her ability to (a) efficiently register and recruit customers, (b) instruct young children while taking their photos, and (c) sell photo packages by addressing customer critiques and concerns, is problematic, particularly given Employer's business model. Employer allows only 20 minutes for each Camera Room sitting—a relatively short period of time, especially when photographing young children. Aplt. App. 53a, 172a.

The only evidence of a verbally impaired employee in the performer position is not really comparable. Ms. Wendy Duke—a former employee— is also hearing impaired, but Ms. Duke is able to speak and can effectively read lips. Id. at 169a. Though the EEOC claims that a jury could find that the differences between Ms. Duke and Employee were not as significant as urged, the EEOC does not dispute that Ms. Duke could read lips and speak and that Employee does very little of either. Order at *5. Furthermore, when 2-2 staffing is employed during most of the year, Employee is unable to fully perform three of the four main duties of a performer, while Ms. Duke was able to converse with customers while

selling photos, id. at 172a, and while taking pictures, id. at 173a ("Every time I go into the camera shoot I use my voice."). Though the EEOC maintains that Employee could communicate non-verbally, nothing suggests that gestures, pantomime, and written communication are similarly effective and efficient for these tasks. When only one other staff member is present, it simply is not feasible to delegate all of these duties. Therefore, based on the factors outlined in 29 C.F.R. § 1630.2(n)(3), we must conclude that verbal communication is an essential function of the performer position.

B.     Were Reasonable Accommodations Available?

If an employee is unable to perform an essential function, the next inquiry is whether the employee could perform this job with reasonable accommodations. See Davidson, 337 F.3d at 1192. Reasonable accommodations are defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position" or "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(ii)-(iii).

The EEOC first argues that Employer was required to modify how Employee worked as a performer "to allow her to communicate with customers

using non-verbal means of communication." Aplt. Br. 32-33. It is axiomatic, however, that an employer is not required to relieve an employee of an essential job function. See Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1122 (10th Cir. 2004) ("[A]n employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation."); Hennagir, 587 F.3d at 1264-65. Given that verbal communication is an essential job function, requiring Employer to eliminate this function cannot be a "reasonable accommodation" required under the ADA.

Next, the EEOC argues that Employer was required to provide ASL interpreters at staff meetings and training sessions. Aplt. Br. 34-35; Aplt. Rep. Br. 21-27; 42 U.S.C. § 12111(9)(B). The EEOC relies upon cases in which a court held that an employer was required to provide an ASL interpreter for staff meetings. Those cases are readily distinguishable. In EEOC v. UPS Supply Chain Solutions, the Ninth Circuit reversed summary judgment, finding a genuine issue of fact as to whether written agendas and outlines were a sufficient accommodation at staff meetings and training sessions, or whether an ASL interpreter was required. 620 F.3d 1103, 1111-13 (9th Cir. 2010). In that case, however, it was undisputed that the employee was able to "complete his job duties [in the accounts payable division] without the assistance of an ASL interpreter." Id. at 1105-06. Similarly, in EEOC v. Federal Express Corp., the Fourth Circuit upheld a jury's award for punitive damages when FedEx failed to

provide ASL interpreters at mandatory meetings and training sessions. 513 F.3d 360, 365, 373-74 (4th Cir. 2008). The employee involved in the case was a package handler whose duties included "sorting, scanning, and stacking packages and letters . . . ." Id. at 365. Again, the employee "did not need or request any accommodations with respect to the routine handling of packages . . . ." Id. Finally, in EEOC v. Wal-Mart Stores, Inc., this court upheld an award of punitive damages when the employee was refused access to ASL interpreters for meetings and training sessions and then fired when he failed to attend without an interpreter. 187 F.3d 1241, 1243-44 (10th Cir. 1999). In that case, the employee worked in the receiving department where his responsibilities included "scanning and marking labels." Id. at 1243. Again, there is nothing to indicate that the employee needed accommodation to perform the essential functions of his job.

This case is different. Employee's position as a performer required her to communicate extensively with customers and to conduct photo sessions with dispatch. Providing Employee with an ASL interpreter at staff meetings would not ameliorate her inability to interact verbally with customers—an essential function of the performer job. This difficulty would preclude Employer from scheduling her during non-peak periods with 2-2 staffing. No reasonable accommodation has been suggested that would allow Employee to perform her job given these constraints.

II.    <u>Whether Picture People Discriminated Against Chrysler and Terminated Her in Violation of the ADA</u>

The district court correctly granted summary judgment on the unlawful termination claim because Employee failed to present facts showing that she was qualified for the performer job. In order to establish a prima facie case of discrimination under the ADA, a showing that the employee was qualified is necessary before proceeding to the third inquiry. <u>See</u> <u>Mauerhan v. Wagner Corp.</u>, 649 F.3d 1180, 1184-85 (10th Cir. 2011); Order at *7.

III.    <u>Whether Picture People Retaliated Against Chrysler in Violation of the ADA</u>

A prima facie case of retaliation under the ADA requires: "(1) that [an employee] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." <u>Hennagir</u>, 587 F.3d at 1265; 42 U.S.C. § 12203. If a plaintiff establishes these factors, the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. <u>Hennagir</u>, 587 F.3d at 1265. If the employer can do so, the burden shifts back to the plaintiff to prove pretext, <u>id.</u>, which requires a showing that the proffered non-discriminatory reason is "unworthy of belief," <u>Johnson v. Weld Cnty., Colo.</u>, 594 F.3d 1202, 1211 (10th Cir. 2010).

We assume, as did the district court, that disciplining Employee and

eliminating her from the work schedule were materially adverse actions. Order at *7. We further assume that the adverse actions were related to the protected activity; the January 2008 Performance Track Counseling statement indicated that Employee announced her intention to bring a grievance against Employer if her hours were not increased. Aplt. App. 341a-42a. Still, Employer presented evidence supporting nondiscriminatory reasons for the adverse actions. Order at *7. Employer states that "the reduction of work hours following the holiday [p]eak occurs as a normal byproduct of [its] normal retail business cycle, and affected all Performers." Aplee. Br. 39. It further claims that Employee's inability to perform all four essential job functions precluded her from being scheduled after the holidays due to 2-2 staffing, id., and this is documented in handwritten notes between Employee and Ms. Doyle, the acting studio manager. Aplt App. 337a-38a. Employer also presented evidence that Employee was counseled because she was coloring with crayons in the lab, letting other Performers handle their own lab work, and refusing to take breaks according to company policy. See Aplt. App. 341a-42a. Employee conceded the alleged infractions. Id. at 343a ("I do the drawings when I'm waiting for upload [sic] to finish . . . ."), 350a ("I did not color when there was something for me to do . . . . I am not the only one who does this.").

Given evidence of legitimate, nondiscriminatory reasons for the adverse actions, the burden shifts to the EEOC to establish pretext. To raise a fact issue

of pretext, a plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive. This court has stated, "a plaintiff can demonstrate pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons for its action, which a reasonable fact finder could rationally find unworthy of credence." Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1104 (10th Cir. 2005), *overruled on other grounds as recognized in* Law Co., Inc. v. Mohawk Const. and Supply Co., 577 F.3d 1164, 1170 (10th Cir. 2009). The EEOC argues that other similarly situated employees engaged in the same behavior for which Employee was reprimanded, but they were never counseled. Aplt. Br. 55-56. As the district court noted, however, evidence of the infractions of other employees was never disclosed by the EEOC. See Order at *8. Furthermore, ample evidence in the record suggests that every employee's hours were affected after the peak holiday period, Aplt. App. 83a, 337a, 338a, 340a, 342a, and that scheduling is different during peak and non-peak periods, the latter requiring employees to perform work in all four listed zones, id. at 206a-09a. As noted, Ms. Chrysler was not qualified to perform work in all four zones with or without reasonable accommodation. Therefore, the evidence in the record comports with Employer's reasons for not scheduling, and ultimately terminating, Employee. See Pinkerton v. Colo. Dep. of Transp., 563 F.3d 1052, 1065-66 (10th Cir. 2009) (stating that, when supervisor's comments about problems with employee are consistent with the listed reasons for

- 15 -

termination, the court is "in no position to state that the numerous documented failures by the [employee] were not serious enough to justify termination"); see also Jones v. Barnhart, 349 F.3d 1260, 1267 (10th Cir. 2003) (a court should not "act as a super personnel department that second guesses employers' business judgments" (internal quotations omitted)).

IV.    The Dissent

The dissent contends that both this court and the district court misapply the summary judgment standard by failing to view the evidence in the light most favorable to the non-movant, and by ignoring direct evidence of retaliatory motive.  These contentions are without merit.

The dissent argues that much of the evidence favoring Employer as the moving party must be disregarded because the jury is not required to believe it.  In Reeves v. Sanderson Plumbling Prods., Inc., 530 U.S. 133 (2000), the Court explained that in deciding a Fed. R. Civ. P. 50 motion for judgment as a matter of law, a court must consider all of the evidence, just as it must consider the record as a whole when deciding a Fed. R. Civ. P. 56 motion for summary judgment.  Id. at 151.  The Court then explained that a court must review the evidence in the light most favorable to the non-movant, not decide credibility issues or weigh the evidence, because the latter two are jury functions.  Id.  The Court then stated:

> Thus, although the court should review the record as a whole, it must
> disregard all evidence favorable to the moving party that the jury is
> not required to believe.  See Wright & Miller 299.  That is, the court

- 16 -

should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

Reeves, 530 U.S. at 151 (internal quotations omitted). The dissent contends that this passage supports disregarding much of the evidence based upon its unsupported perception that Employer's witnesses were biased—they had pre-determined ideas about the limits of the deaf. In employment discrimination cases, the employer's agents frequently will supply the testimony, yet they cannot be deemed interested parties any more than the dissent can impute bias to them. See Traylor v. Brown, 295 F.3d 783, 790-91 (7th Cir. 2002). Moreover, the principle that we disregard controverted evidence does not displace the responsibility of a court to review the record as a whole, and to consider uncontroverted evidence in favor of Employer. Id. This is the teaching of Reeves, which recognized that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148. This is the case here.

There are other important summary judgment principles over which the dissent rides roughshod: the movant is not required to disprove the non-movant's

case, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the non-movant must come forward with significantly probative evidence that would support a verdict in its favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

First, the dissent argues that Employer's judgment about what is an essential job function is controverted because none of the job descriptions include oral communication as a job *duty*, but rather use the term "verbal communication skills" as a job *qualification*. This is a very thin reed, understandably not grasped by the parties. Strong verbal communication skills are listed as "Job Qualifications" on descriptions for both the Seasonal Associate and Performer positions. 1 Aplt. App. 99a, 101a. Listing strong verbal communication as a requirement for a customer-service oriented job was certainly *reasonable* on the part of Employer. In determining whether a function is essential we simply have no license, absent evidence, to disregard a natural reading of a written job description.

The dissent's major point is that Employee could communicate effectively. The dissent relies on the photo shoot with the Krols, and "several other shoots" that Employee allegedly participated in. But any review of the evidence in the light most favorable to Employee does not reveal a genuine issue of material fact that would require submission to a jury. When Employee was asked how many times she took photographs in the camera room, she said "15, 20, maybe less. I

- 18 -

don't know." Id. at 246a-47a. When asked how many of those times she was by herself, she answered, "[a] couple." Id. at 247a. On most of these occasions, therefore, Employee was accompanied in the camera room by a performer who could hear and communicate orally with customers. At best, except for on very limited occasions, Employer did not find Employee qualified to work in the camera room on her own.

While the dissent points to a blanket statement given by Employee's vocational rehabilitation counselor that "deaf persons can perform a job calling for strong customer service skills and oral communication skills by using gestures, notes, and so forth," this simply does not address Employee's abilities any more than the fact that Employer hired Employee in the first place. In fact, it is uncontroverted that Employee had minimal lip-reading capability, and scored below average on tests administered by the EEOC's expert. 2 Aplt. App. 310a. And while it is possible that Employee could, to some extent, "communicate with customers in the Employer's setting and ensure that they had a pleasant experience," it is unreasonable to expect Employer to reallocate specific job duties—requiring more than one person in the camera room at a time, or not requiring her to perform sales duties—in order to accommodate. See Milton v. Scrivner, Inc., 53 F.3d 1118, 1124 (10th Cir. 1995). Employee's job required her to take photos of very young children—who are easily distracted and in need of constant direction—in an expeditious manner. Similarly, interaction with parents,

both in the photo room, and while selling the photographs, was part of her job. Therefore, effective communication was key. As we have stated, "the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards." See Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004) (internal quotation marks omitted). A court should be hesitant in displacing the business judgment of an employer on how to run its business.

The dissent also contends that this case is controlled by Davidson v. America Online, Inc., 337 F.3d 1179, 1191 (10th Cir. 2003). Davidson is patently distinguishable. The case involved a change in company policy which effectively prevented America Online from hiring new deaf employees—even for jobs that did not require oral communication skills. Id. at 1191-92. An obvious and critical difference between Davidson and this case is that neither the district court nor the court of appeals in Davidson considered an individual's performance on the job, as we have done here. Instead, those courts found that a jury should decide whether a blanket policy preventing deaf individuals from being hired for jobs that only required them to answer emails and handle mail could be justified as a business necessity. Id. at 1182-83, 1191-92. Therefore, summary judgment in favor of America Online was improper. Id. at 1192. Since we have abundant evidence in the record about Employee's particular job performance here, the cases are easily distinguishable.

The dissent also claims that the court overlooks direct evidence of retaliation and that any time there is direct evidence it is sufficient evidence of pretext requiring submission of a retaliation claim to the jury. We disagree. To be sure, in an indirect case, a plaintiff may survive summary judgment with a prima facie case and a showing of pretext or direct evidence of discrimination in response to an employer's legitimate reasons for its actions. See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1397 (10th Cir. 1997). But we doubt this means that summary judgment can never be granted when there is direct evidence of retaliation, no matter how weak in the context of the entire record: such a rule would insulate one class of cases from summary judgment principles.

We need not decide that issue. This circuit has a very high bar for what constitutes direct evidence of retaliation: it does not require any inference or presumption. Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 1000 n.8 (10th Cir. 2011). The statement the dissent relies upon, coming in the context of a two-page performance evaluation, is not direct evidence:

- Insubordination: You don't seem to realize that people revolve around the business; the business doesn't revolve around the people. You became angry and threatened to bring a grievance against the Picture People when you didn't get your hours increased.

2 Aplt. App. 341a. The letter requires us to infer retaliatory motive from a chain of events—that the disciplinary notice was given to Employee because she asserted her ADA rights, and not because of the several other problems noted on

- 21 -

the performance evaluation.  This differs from the termination letter in the case referenced by the dissent, <u>Medlock v. Ortho Biotech, Inc.</u>, 164 F.3d 545 (10th Cir. 1999).  In that case, the letter stated that "[a]s a result of issues raised in your deposition [including Title VII race discrimination claims], effective immediately, you are suspended from all duties on behalf of the Company."  <u>Id.</u> at 550.  That letter did not require an inference; it directly stated that the Title VII claims were the reason for the termination.  That is not the case here.

Summary judgment on the retaliation claim is proper.  Employee claims that she was treated differently from other employees who engaged in the same behavior, but does not allege any specific facts or incidents to back it up.  Though the dissent views that as sufficient, on summary judgment more is required.  <u>See</u> <u>Jones v. Denver Post Corp.</u>, 203 F.3d 748, 756 (10th Cir. 2000).  Summary judgment based upon disparate discipline moves from generalities to specifics: who, why, when, and where.  Further, while Employee claims that the fact that she was not scheduled after Christmas shows pretext, Employer has come forward with a non-discriminatory reason for its failure to staff her: she could not perform all functions of the job and, therefore, could not be staffed during 2-2 staffing.

The performance evaluation does contain numerous non-retaliatory reasons.  These include: refusing to take a break, spending time on the clock to color, and demanding hours after initially refusing to shoot photo sessions in December.  2 Aplt. App. 341a.  It mentions that Employer was only able to schedule Employee

during busy times because of her inability to perform all required tasks.  <u>Id.</u>

Employee has failed to identify sufficient evidence to create an issue of fact as to pretext.

AFFIRMED.

**HOLLOWAY**, Circuit Judge, dissenting:

**I**

Ms. Jessica Chrysler was hired as a photographer or "performer" at the Littleton, Colorado studio of Defendant-Appellee The Picture People, Inc. (the Employer). The manager who hired her had full knowledge of her deafness and the means by which she can communicate, and he also had the experience to fully understand the requirements of the job.

When Ms. Chrysler was given an opportunity to conduct a photo session, her performance was given high praise by the customers. She conducted a number of other sessions as well, and there is no evidence that these sessions were less than successful in any way. Nevertheless, acting on what a jury could well determine was nothing more than a stereotyped view of the limitations of the deaf, the Employer first relegated Ms. Chrysler to work only in the lab, then eliminated all of her hours, and finally, after months of hollow promises that she would be given some opportunities, it fired her. Not only that, but the Employer explicitly chastised Ms. Chrysler for having the temerity to complain about her treatment.

The EEOC brought this case against the Employer alleging (1) that the Employer had discriminated against Ms. Chrysler because of her deafness[1] in

---

[1]The complaint alleged three discrete discrimination claims: (1) failure to accommodate; (2) wrongful termination; and (3) hostile work environment. The

violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12213 (2006) (ADA)[2]; and (2) that the Employer had retaliated against Ms. Chrysler "for her requests for accommodation and complaints of discrimination." Despite substantial evidence that Ms. Chrysler had performed well, the district court granted summary judgment for the Employer, holding that Ms. Chrysler was unable to perform the "essential functions" of the job and thus was not a "qualified individual" entitled to the protection of the ADA. Thus, the judge concluded that she could not do that which she had in fact done. Moreover, although faced with the fact that Ms. Chrysler had been disciplined explicitly for invoking her rights, the district court nevertheless concluded that the EEOC had not produced enough evidence to defeat summary judgment on the retaliation claim.

The opinion affirms these illogical holdings. Like the district court, the opinion fails to apply the proper standard in evaluating the evidence. When the evidence is taken in the proper light, I am convinced that the judgment must be reversed. I therefore respectfully dissent.

**II**

---

EEOC does not appeal from the district court's grant of summary judgment to the Employer on the third claim.

[2]This lawsuit is based on events that occurred before the ADA was amended in 2008.

A.

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). Under Fed. R. Civ. P. 56, summary judgment should be entered by the district court "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." On appeal,

> [w]e examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the substantive law was applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*McKnight*, 149 F.3d at 1128 (brackets and quotations omitted). Furthermore, in our review of the record we "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

Because the majority opinion fails even to acknowledge – much less to view in the favorable light as it should – much of the evidence that the EEOC submitted to the district court, it is necessary to survey that evidence in some detail. In keeping with our standard of review, the following recitation of the evidence will be focused on the EEOC's evidence and should be understood as representing what a properly instructed, rational jury *could* find, based on that evidence. Testimony favorable to the Employer in this case comes mostly from its own employees, and the jury of course would not be required to accept their testimony. Therefore, that

evidence should not be considered at this stage. *Id.* (noting that the courts should give credence to the evidence favorable to the moving party on summary judgment only if that evidence is "uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses").

B.

Ms. Chrysler is congenitally deaf. She communicates in American Sign Language (ASL), and with written notes, gestures, and facial expressions. She also can use a computer. III Aplt. App. 593a. These methods work when she communicates with one person or a small group, but she needs a sign language interpreter for group settings such as the staff meetings held by the Employer during her brief tenure.

The Employer's business is photography, and it specializes in portraits of children of age five and younger. Ms. Chrysler was hired on October 23, 2007, to work at the portrait studio in Littleton, Colorado, one of a number of the Employer's branches. Ms. Chrysler was hired by Mr. Aguilar, who was then the manager of that studio. She was hired as a photographer, a position that the Employer calls "associate" or "performer."

Performers had four general areas of responsibility: customer intake, sales, portrait photography, and laboratory duties. Mr. Aguilar intended to use Ms. Chrysler primarily in the "camera room" taking pictures. Mr. Aguilar had previously worked for the Employer in another location where he had worked with a deaf

woman photographer, Ms. Duke, and Mr. Aguilar thought that Ms. Duke was very capable.

Ms. Chrysler was scheduled for an initial orientation and training program that the Employer requires for all new hires. One of the goals of the training is to transmit the Employer's philosophy, which emphasizes not just the quality of the portraits it produces but also the quality of the customer's experience. On being hired, Ms. Chrysler requested that an ASL interpreter be provided for the training session. Mr. Aguilar agreed that one was needed but had no idea how to arrange it. He contacted his district manager, Candi Bryan, about it. Ms. Bryan told Mr. Aguilar that the Employer did not provide such services. Aguilar and Chrysler each contacted Employer's human resources department. A human resources official suggested that Mr. Aguilar check local churches for volunteer interpreters. A "Sr. Human Resources Mgr." sent an e-mail to the studio manager saying that hiring an interpreter "to be around the studio while this employee is working . . . seems like an expense we would like to do without." II Aplt. App. 395a. Employer provided no other assistance to Aguilar as he attempted to make arrangements for an interpreter.[3]

The Employer's failure to provide an interpreter (as noted, the Employer did

_____

[3]The majority says that the Employer was "unable" to provide an interpreter, but the evidence reflects that the Employer never made any attempt to do so. Maj. op. at 4.

-5-

not attempt to provide an interpreter) caused Ms. Chrysler's start date to be delayed by three weeks. Eventually, Ms. Chrysler learned that the Colorado Division of Vocational Rehabilitation, which had been helping her in her job search, could provide interpreters for their clients' initial training, and at Ms. Chrysler's request this was done for her three days of initial training in mid-November 2007. Ms. Chrysler completed the training and was assigned to begin working in the camera room.

The day after completing the training, Ms. Chrysler had a photo session with the Krol family and their infant. This went very well and the Krols were very pleased, so much so that they bought more pictures than they had planned to buy, III Aplt. App. 740a-741a, and returned the next month for another session.[4] At that time, they requested to work with Ms. Chrysler again but were told that she was not available. In fact, she was available but the Employer had relegated her to lab work only at that time.

Just three days after the Krols' session with Chrysler, two managers visited the Littleton studio to conduct advanced training for the staff. Ms. Chrysler attended.

---

[4]This is presumably the occasion to which the majority refers when it says that Ms. Chrysler "attempted to conduct a shoot by herself . . . ." Maj. op. at 4. This results from failure to adhere to the proper summary judgment standard of taking the evidence in the light most favorable to the party opposing summary judgment. Ms. Chrysler did not just "attempt" to conduct a shoot by herself – she *did* conduct this shoot by herself with a good result for both the Employer and the customers. Mr. Aguilar testified that Ms. Chrysler had made a "huge sale." I Aplt. App. 96a.

She requested an interpreter, but none was provided. Consequently, she could not benefit from the training session. One of the managers providing the training contacted district manager Bryan to express concern about Chrysler. (Apparently the concern was not that Ms. Chrysler had not been provided an interpreter, but concern that she had been hired as a photographer.) The next day Ms. Bryan directed Mr. Aguilar to assign Ms. Chrysler to the lab. Mr. Aguilar demoted himself from studio manager to performer that same day (a decision which, Aguilar later testified, was not related to the direction regarding Ms. Chrysler). Management of the Littleton studio was assigned, temporarily, to assistant manager Kim Doyle, with Deidre Sandoval to be her assistant. The Employer directed them to assign Ms. Chrysler only to the lab.

Ms. Chrysler testified in her deposition that she had conducted as many as 15 to 20 photo shoots for the Employer, most with other employees present and "a couple" by herself. She said that district manager Bryan was with her during one session. Most significantly, she testified that no one ever expressed concern to her about how those sessions had been conducted. On appeal, the Employer has not identified any evidence that there was any deficiency in Ms. Chrysler's performance during the times that she conducted photo sessions, and my search of the record has produced no such evidence.[5] Accordingly, a jury could conclude that the decision

_____

[5]As noted in the majority opinion, the Employer's brief cites testimony to the effect that Ms. Chrysler's alternative modes of communication would be

to assign Ms. Chrysler to work only in the lab, where she would have no contact with customers, was based on nothing but stereotyped assumptions against the abilities of the deaf. This is what the ADA was intended to counter.

The studio occasionally held mandatory staff meetings. During the six weeks that Ms. Chrysler worked there, she requested an interpreter for the meetings, but none was ever provided. Instead, the Employer merely gave her a written outline or agenda. As a result, she was not able to benefit as intended from the discussions in the meetings.

The Employer's business is seasonal. Ms. Chrysler had been hired as part of a pre-holiday expansion of the work force because Christmas is one of the busiest seasons. Immediately after Christmas, business slowed down dramatically at least

"simply impractical" in the camera room. This evidence might be sufficient to create an issue of fact such that summary judgment in favor of the EEOC would not have been proper. But it cannot do more.

As I note in the text of this dissent, in reviewing this summary judgment in favor of the Employer, we are bound to disregard evidence favorable to the Employer "that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). Moreover, the Employer's brief, in the passage quoted in the majority opinion, cites in support of its statements the deposition testimony of three witnesses, none of whom testified to having observed any of Ms. Chrysler's photo sessions. (Ms. Chrysler testified that Ms. Bryan had observed one session, but Ms. Bryan testified that she observed Ms. Chrysler only in a class.) A jury could decide that the concerns expressed by these witnesses were based on predetermined ideas of the limits of the deaf. But in the posture of this appeal, this panel should disregard this evidence because a jury would not be required to accept it rather than the evidence presented by the EEOC.

until Valentine's Day, with the result that most employees got substantially reduced hours. But Ms. Chrysler was never given another shift after Christmas Eve.

When Ms. Chrysler noticed that she was not listed on the first schedule to come out after Christmas, she complained to acting manager Doyle. Ms. Doyle told Ms. Chrysler she would love to have her on full-time but there simply was not enough work for anyone to get full-time assignments in January. In an exchange of written notes, Ms. Doyle told Ms. Chrysler she would try to find some shifts for her. Ms. Doyle then sent a message to district manager Bryan saying that Ms. Chrysler was "demanding hours" and "threatening discrimination."[6] Ms. Doyle prefaced this message with three other complaints about Ms. Chrysler: she was "causing trouble arguing with the managers and trying to refuse to take a break"; she was coloring with colored pencils in the lab during work hours; and she had declined "a few opportunities to shoot" when the studio was really busy.[7]

District manager Bryan forwarded Ms. Doyle's message to a representative of human resources. That person later testified that she thought the matter had been referred to her for discipline because she understood (or assumed), incorrectly, that

[6]The latter was meant to say that Ms. Chrysler was threatening to complain of discrimination, as Ms. Doyle testified in her deposition. III Aplt. App. 704a-706a.

[7]This complaint that Ms. Chrysler had declined opportunities to conduct photo sessions is puzzling, but I find nothing in the record to explain why Ms. Chrysler declined opportunities, and neither party bases any argument on this evidence.

management at the Littleton studio had communicated with Ms. Chrysler and that Chrysler had refused to change her behavior. That same day, district manager Bryan drafted a disciplinary notice for Ms. Chrysler. Although this was the first notice to Ms. Chrysler of any problem, the document was labeled a "final warning." *It reprimanded Ms. Chrysler* first for refusing to take breaks and second *for becoming angry and threatening to "bring a grievance" against the employer.* II Aplt. App. 341a. Ms. Chrysler was also reprimanded for coloring in the lab.

In the disciplinary notice as later delivered to Ms. Chrysler was a message to Ms. Chrysler about her hours: "Due to the limited tasks that you are qualified to perform, we can only schedule you on very busy times with other groups of employees. There are not very many busy times in January . . . . If you want more hours, wait 'till the next peak period, perhaps Valentine's Day." After that, Ms. Chrysler called the studio weekly to see if she had been scheduled for any shifts. Despite the suggestion in the notice that Ms. Chrysler might get more hours in the period before Valentine's Day, she never was given any work time after Christmas Eve in 2007.

On March 6, 2008, Ms. Chrysler filed a discrimination charge against the Employer with the EEOC. In its response to the charge, the Employer said that Ms. Chrysler had not been terminated and told the EEOC that it would contact Chrysler when business increased "so that she may be able to continue her employment," and said that this might occur in the weeks before Father's Day (which had previously

proved to be a busy time for the studio). In May 2008, Ms. Chrysler visited the new manager of the Littleton studio about getting some shifts.

The Employer never contacted Ms. Chrysler, never gave her any more work, and formally terminated her in October 2008. These are the basic facts on the discrimination charge and the retaliation charge on which the district court ruled.

## III

### A.
### *The ADA coverage*

In enacting the ADA, Congress stated, *inter alia*, that its purpose was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(1). Congress found that individuals with disabilities experienced "restrictions and limitations . . . resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society . . . ." 42 U.S.C. § 12101(a)(7).

Coverage under the ADA extends to one who is a "qualified person with a disability" and that in turn is defined as one who "with or without reasonable accommodation, can perform the essential functions" of the position in question. Therefore, a necessary first step is to identify the "essential functions" of the position. "Essential functions" are the fundamental duties, not the "marginal functions of the position." *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1191

-11-

(10th Cir. 2003).  Determining whether a particular duty is "essential" is a *factual* inquiry based on a number of factors, including but not limited to the employer's judgment as to what duties are essential and any written job description the employer prepared for the position.  42 U.S.C. § 12111(8); *Davidson*, 337 F.3d at 1191 ("Determining whether a particular function is essential is a factual inquiry.").

But the employer's judgment is not conclusive evidence.  As this court has said, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Davidson*, 337 F.3d at 1191.  More specifically, we deal here with a purported "essential function" that the Employer now seeks to define in such a way as to eliminate an entire class of disabled persons – those who do not communicate well orally.[8]

The majority correctly notes the legal principles that establish when an employer may adopt such qualification standards.  By statute, such a qualification standard may only be used when "consistent with business necessity."  42 U.S.C. § 12112(b)(6), quoted in maj. op. at 7.  The majority also correctly notes that an employer *must* make "reasonable accommodations" for an otherwise qualified person unless the employer can show that the accommodation "would impose an undue hardship" on the employer's operations.  42 U.S.C. § 12112(b)(6), quoted in maj. op.

---

[8]As discussed in the text *infra*, the EEOC's position is that oral speech is a job qualification, but not necessarily an "essential function."

at 7.

The Employer's primary contention is that the ability to communicate orally is an essential function of the position. The EEOC's primary contention is that ability to communicate orally is a *method* by which most employees perform the essential function of communicating with the customers.

The Employer offered two job descriptions in its materials supporting its motion for summary judgment, one for the position of "performer" and one for the position of "seasonal associate." Both listed as job duties making customers feel welcome and comfortable and providing customers with a variety of distinct portraits. The Employer's witnesses gave similar descriptions of the job duties, such as: greet customers as they arrive and check them in at the front desk (intake); ascertain the kind of pictures the customer wants and take pictures that satisfy the customer, which includes communicating with the customer on desired poses (photography); develop pictures in the lab; and sell the customer a package of pictures (sales). Notably, none of these descriptions includes as a job duty a requirement of oral communication.[9] A jury could find from this evidence that oral communication is "*a useful skill or method* to perform the essential functions" of

---

[9]The job descriptions (one for "seasonal associate" and one for "performer") listed "strong verbal communication skills" as a "job qualification," not as a duty. I Aplt. App. 99, 101. Both parties seem to accept that "verbal communication" in this instance was meant to convey "oral communication," which is the usage adopted in the majority opinion as well.

communicating with customers, but one that is "not in itself an essential function of the . . . position." *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273 280 (3d Cir. 2001) (emphasis added). Significantly, *Skerski* noted that the legislative history of the ADA indicated that the "essential function requirement focuses on the desired result rather than the means of accomplishing it." *Id.* (quoting 136 Cong. Rec. 11,451 (1990)).

The majority says that Ms. Chrysler "is unable to fully perform three of the four main duties of a performer." Maj. op. at 9. Rejecting the EEOC's evidence that Ms. Chrysler can communicate effectively using her alternative means, the majority further says that "nothing suggests that gestures, pantomime, and written communication are similarly effective and efficient for these tasks." *Id*. at 10. I strongly disagree. Considerable evidence was produced from which a jury could determine that Ms. Chrysler could communicate effectively.

Most notably, there was evidence that Ms. Chrysler not only could but *did* communicate effectively and efficiently. First, there is the evidence of the photo session with the Krol family, discussed *supra*. Only by ignoring this clear example of Ms. Chrysler's ability to perform the essential functions of photo shooting and sales can the majority find that "nothing suggests" that she could do that which she had in fact already done. Moreover, Ms. Chrysler conducted several other shoots, some by herself and some with another employee present. No evidence has been cited to us suggesting that there were any communication problems in conducting

these sessions. Mr. Aguilar testified that he never received a complaint from a customer for whom Ms. Chrysler had taken photos. III Aplt. App. at 613a.

It appears that none of the employees who worked with Ms. Chrysler in photo sessions testified; in any event, the Employer has not cited any record evidence that any of these persons observed deficiencies in her performance. Consequently, in the face of Ms. Chrysler's testimony that she had conducted 15 to 20 photo sessions, there is no evidence of any resulting communication problems.[10]

As for the efficiency of the communication, again there is no evidence that any of Ms. Chrysler's sessions were out of the ordinary in duration. Of course the Employer's ultimate interest is sales. The only evidence in the record regarding Ms. Chrysler's performance in this area comes from her manager, Mr. Aguilar, who testified that Ms. Chrysler made a "huge sale" to the Krol family, successfully selling the Krols more photos than they had originally planned to purchase. I Aplt. App. 96a; see also n.4, *supra*, and accompanying text.

It is surely relevant also that Ms. Chrysler was, after all, hired by the branch's manager, Mr. Aguilar, with full awareness of both the job requirements and Ms.

---

[10]The Employer's scant evidence should in any event be disregarded in view of the summary judgment posture of this appeal, because a rational jury could find Ms. Chrysler's evidence on this point more credible than the Employer's. The resulting conclusion that naturally follows such a credibility finding would be that the Employer's decisions were based only on stereotyped assumptions about what Ms. Chrysler could do, rather than on actual observations of how she had in fact performed. See n.5, *supra*.

Chrysler's deafness. Mr. Aguilar had been with the Employer for some years and believed that Ms. Chrysler could perform the job. As noted, he had worked with a deaf performer in the past. A jury could find these facts highly relevant in determining whether the ability to communicate orally is indeed a business necessity.

The EEOC produced additional evidence of Ms. Chrysler's abilities. Her vocational rehabilitation counselor, Ms. Barbara Bryant, testified, based on her experience in working with the disabled, that deaf persons can perform a job calling for strong customer service skills and oral communication skills by using gestures, notes and so forth. The counselor also testified that, based on her experience working with her, Ms. Chrysler could communicate with customers in the Employer's setting and ensure that they had a pleasant experience. The EEOC's vocational expert, Mr. Newman, also testified that Ms. Chrysler could perform the essential functions of the performer position with reasonable accommodation.

In sum, substantial evidence was presented from which a jury could determine that oral communication is not an essential function of the job but a *method* for performing the essential function of communication, and that Ms. Chrysler could perform the essential function of communication with or without reasonable accommodation. Thus the summary judgment against the EEOC on the discrimination claims was clearly unjustified.

## B.
### *The Davidson precedent*

In *Davidson v. America Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003), as in this case, the employer "relied on [the job claimant's] disability" as a reason for the challenged employment decision.[11] In both cases, the affected employee or prospective employee was deaf. We said there that if the employee or prospective employee "is in fact statutorily disabled, the determinative issue in the case will not be the employer's intent, but whether the employee is 'otherwise qualified,' with or without reasonable accommodation, to perform the job, *a factual dispute that is resolved through traditional methods of proof.*" 337 F.3d at 1189 (emphasis added).

In *Davidson*, as in this case, the decisive issue was whether the plaintiff was "otherwise qualified" for the position, *i.e.*, whether he could, with or without reasonable accommodation, perform the essential functions of the position. As here, that key issue depended on whether the employer's requirement related to an "essential function" of the job. And that is a fact question for the jury: "Determining whether a particular function is essential is *a factual inquiry*." *Id.* at 1191 (emphasis added); *see also Kellogg v. Energy Safety Services, Inc.*, 544 F.3d 1121, 1127-28 (10th Cir. 2008) (holding, *inter alia*, that "the jury could properly

---

[11]In *Davidson,* the plaintiff had applied for a job in the employer's customer service call center in Utah. The employer staffed the call center with "voicephone" and "non-voicephone" positions. Plaintiff applied for a non-voicephone position, which a deaf person could perform. But the employer required for that position experience in a voicephone position. This requirement, like Picture People's purported requirement that performers have oral communications skills, effectively disqualified all deaf applicants.

have found that neither of [the employer's] claimed job requirements was an essential function of Ms. Kellogg's job."); *Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 914) (10th Cir. 2004) (issues on appeal included "whether the jury could have found" that employer's requirements "are not essential functions" of the position at issue).

I am convinced that *Davidson* is directly on point and mandates reversal of the summary judgment in favor of the Employer. A *jury* must decide whether oral communication skills are an essential function of the job or only the manner in which most hearing employees perform the job. Indeed, I find it astonishing that on this record the district court and the majority rule *as a matter of law* that Ms. Chrysler could not perform the essential functions of the position when in fact the evidence that she could do so was considerably stronger than the minimum necessary to submit these *factual* questions to the jury.

A jury could determine that the Employer's decisions were based on exactly the kind of stereotypes that the ADA was enacted to combat. Congress has codified its views on this point: "[P]hysical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." 42 U.S.C. § 12101. Moreover, lawsuits like Ms. Chrysler's are precisely the mechanism Congress envisioned for correcting such injustice: "It is the purpose of [the ADA] . . . to provide a clear and comprehensive national *mandate* for

the elimination of discrimination against individuals with disabilities." *Id.* (emphasis added). It is distressing that this court should affirm the ruling below, refusing to submit the issues to a jury and for it to do so without careful adherence to our duty to view the facts in the light most favorable to the party opposing summary judgment. I would reverse the judgment of the district court and hold that the claims of wrongful termination and failure to accommodate must be submitted to a jury.

## C.
### *The retaliation claim*

Ms. Chrysler's claim of retaliation is even stronger than her claim of discrimination. The record shows that disciplinary action was initiated against Ms. Chrysler *when* she threatened to bring a grievance complaining of the Employer's alleged discrimination on the basis of Chrysler's deafness.[12] Such timing is, of course, a fact from which a jury could infer retaliatory motive. But here there is significantly more. Not only was discipline initiated *when* she asserted her rights; it was initiated *because* she asserted her statutory rights: The disciplinary notice she was given specifically reprimanded her for asserting her ADA rights!

In criticizing Ms. Chrysler's actions, the Employer directly impugned her for the fact that she "became angry and threatened to bring a grievance." II Aplt. App.

---

[12]Ms. Chrysler's supervisor wrote a message saying that Ms. Chrysler was "threatening discrimination," but no one disputes that this confusing language referred to Ms. Chrysler raising the issue of the Employer's discriminatory behavior. III Aplt. App. 704a-706a.; *supra* n.6.

-19-

341a. It is hard to imagine more direct proof of mistreatment for relying on her statutory rights. *Direct evidence of retaliatory motive is evidence of pretext sufficient to require submission of the issue to the jury. See Crowe v. ADT Security Services, Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 551 (10th Cir. 1999); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 & n.5 (10th Cir. 1997); *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). The majority's startling holding here that direct evidence of retaliatory motive is insufficient to create a genuine issue of material fact is directly contrary to these precedents.

To overcome summary judgment on the issue of pretext, the majority correctly notes, "a plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive." Maj. op. at 14-15. Both of these requirements are satisfied in this case. Yet the majority chooses to scrutinize *additional* evidence of retaliatory motive while ignoring the direct evidence of that motive, *i.e.*, the fact that the Employer reprimanded Ms. Chrysler specifically for saying that she might pursue a remedy for the discriminatory treatment she had received. The fact that discipline was initiated *because* of protected activity, even if only partly because of that activity, is sufficient evidence for a jury to find retaliatory motive. *See Conner*, 121 F.3d at 1396 & n.5. Moreover, the majority's efforts to dismiss the *additional*, indirect evidence of pretext is unconvincing.

Ms. Chrysler was disciplined for conduct that others engaged in without

-20-

repercussion. The district court discounted this evidence on the basis that the EEOC "provided no details about the other employees and their infractions that would allow a jury to conclude these employees were similarly situated to Chrysler." III Aplt. App. 867. Ms. Chrysler testified that the other employees worked with her in the lab and engaged in the same conduct for which she was disciplined. At the summary judgment stage, I would hold that this is sufficient to raise an issue as to whether those other employees were situated similarly to Ms. Chrysler.

Moreover, there is considerable additional evidence that the Employer's stated reasons were pretextual. The majority correctly notes that all (or at least most) employees had their hours reduced after the holiday season.[13] But Ms. Chrysler's hours were totally eliminated – not just reduced – and not just in the period immediately following the holiday season but for ten months until she finally was terminated. There is no evidence that any other employee's hours were "reduced" so drastically. Not only that, but the Employer repeatedly promised Ms. Chrysler that she would be given some work, promises which the Employer never fulfilled; indeed as far as this record reveals, the Employer never attempted to fulfill those promises.

The EEOC identified even more evidence of pretext in its briefs, such as the

---

[13]The majority also cites Ms. Chrysler's supposed inability to perform all of the functions of the job to excuse the Employer's actions. I have already explained my disagreement with that thesis.

discrepancies between testimony of district manager Bryan and other witnesses. But with direct evidence of discriminatory motive and the evidence I have already noted, further discussion here is not necessary. If temporal proximity plus circumstantial evidence of retaliatory motive is sufficient – and the majority correctly says that it is – then how can temporal proximity plus *direct* evidence of retaliatory motive be insufficient? Our precedents say that it is sufficient. I strongly disagree with the majority's holding that the retaliation claim may be rejected by a summary judgment.

## Conclusion

The majority opinion fails to take the facts in the light most favorable to the EEOC as we are bound to do in the posture of this case, leading to the surreal conclusion that Ms. Chrysler is unable, as a matter of law, to perform the tasks that she had completed successfully. On the retaliation claim, the majority ignores direct evidence of retaliatory motive and incorrectly finds the remaining evidence insufficient.

In sum, I would reverse the district court and remand for a properly instructed jury to resolve the genuine issues of material fact that are presented here. Accordingly, I must respectfully but emphatically dissent.